Pamela D. Weiss
Blair M. Christensen
Assistant Municipal Attorneys
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
Email: uslit@muni.org

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KELSEY HOWELL, as P.R. for ESTATE OF DAN DEMOTT, JR., ) ) ) | |
| Plaintiff(s), ) ) | |
| vs. ) ) | |
| MUNICIPALITY OF ANCHORAGE, LUIS SOTO, and STEVEN E. CHILDERS, ) ) ) | |
| Defendants. ) ) | Case No. 3:20-cv-00301-SLG |

## MUNICIPAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Municipality of Anchorage, Luis Soto and Steven Childers, by and through attorneys Blair M. Christensen and Pamela D. Weiss move for summary judgment pursuant to Federal Rule of Civil procedure 56.

## INTRODUCTION

Plaintiff's complaint asserts claims for excessive force and negligence as well as *Monell* claims against the Municipality. Municipal Defendants are entitled to summary judgment on these claims.

The individual named defendants, Sergeant Steven Childers and then-Sergeant Luis Soto are members of the SWAT team, who responded to the SWAT call out at the residence of Dan Demott Jr. ("Demott") after his daughter Kelsey Howell ("Howell) called for assistance. Numerous other officers responded to the call or as part of the SWAT call out that followed.

There is no further discovery to be conducted in this matter. The deadlines for discovery have all passed.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment is used "to isolate and dispose of factually unsupported claims."[1] Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[2] Material facts are those that might affect the outcome of the case.[3]

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.[4] If the moving party satisfies its burden,

---

[1] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).
[2] Fed. R. Civ. P. 56.
[3] *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).
[4] *Celotex Corp.*, 477 U.S. at 323.

the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.[5] To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[6]

A party cannot avoid summary judgment by relying solely on conclusory and unsupported allegations.[7] Nor can the party avoid summary judgment by relying on mere allegations or denials.[8] The opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial.[9]

To reach a level of genuine dispute, the evidence must be such as to allow "a reasonable fact-finder to return a verdict for the non-moving party."[10] "If the evidence provided by the non-moving party is 'merely colorable' or 'not significantly probative,' summary judgment is appropriate."[11]

---

[5] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).
[6] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987).
[7] *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).
[8] *Anderson,* 477 U.S. at 248-249.
[9] *See Celotex Corp.,* 477 U.S. at 324.
[10] *Anderson,* 477 U.S. at 248.
[11] *Millo v. Delius*, 872 F.Supp.2d 867, 872 (D. Alaska 2012) (citations omitted).

## A. 911 Call and APD Initial Response.

At approximately 6:30 p.m, on November 5, 2018, Kelsey Howell ("Howell") called 911.[13]  She told the dispatcher that her dad, Dan Demott ("Demott") was "crazy," ripping the curtains down in her room and barricading the front door.[14]  She also said she was not sure he would cooperate with police and that he had attacked police in the past.[15]  Howell informed the dispatcher of her father's mental health diagnoses, advised that he was not taking his medication, and that he had previously been to API.[16]  Throughout the call, Demott can be heard yelling in the background.[17]

After the initial officers arrived on scene, dispatchers called Howell back and asked her and any others to leave the house.[18]  Howell dressed her children and the three of them left the residence with three other adults – two temporary occupants and Demott's son, Justin Charlie.[19]  However, a man named "Mike" did not exit.[20]

---

[12] Facts are primarily taken from the police reports, audio recordings and Computer Aided Dispatch (CAD).  The police reports and CAD accompany an Affidavit of APD Records Custodian, attached as Exhibit A. The audio recordings are found at Exhibits B and C, which will be filed conventionally.

[13] Ex. A at 22, CAD entry 18:34:02.

[14] Ex. B-1, 911 audio (BN 909) at :11-:18.

[15] Ex. B-1, 911 Audio (BN 909) at 1:18-1:38.

[16] Ex. B-1, 911 Audio (BN 909) at :22-:25 & 1:42-1:50.

[17] Ex. B-1, 911 Audio (BN 909).

[18] Ex. B-2, Audio (BN 910) at :02-:33; Ex. B-3, Audio (BN 911) at :04-:50.

[19] Ex. B-3, Audio (BN 911) at :44-:48 (stating there will be "4 of us"); Ex A at 23, CAD entry 19:22:01 & 19:35:16.

**[20]** Ex. A at 7, Fifer report at p. 2; Ex. A at 16, Perez report at p. 4.

## B. Presence of Weapons.

When officers arrived on scene, they discovered that Demott had weapons. An officer reported to dispatch that he observed Demott with a sword.[21] Not long after that, an officer reported to dispatch that Mr. Demott had a rifle.[22] Officers were later advised that the rifle was believed to be a BB gun.[23] They confirmed with Demott's son, Justin Charlie ("Charlie"), that Demott had a BB gun and sword; they also learned there were other firearms in the home, including a .22 rifle and a .22 handgun. The weapons were reported to be in a bedroom safe and Charlie did not think that Demott could find the key.[24]

## C. Interview with Kelsey Howell and Warrants Issued.

Officer Rosendo Perez arrived on scene and spoke with Howell.**[25]** Among the information she shared with him was:

- Demott was her father;

- Demott was "snapping", "getting mad" and "yelling";[26]

---

[21] Ex. A at 22 CAD entry 19:11:58. He was later seen again with the sword. Ex. A at 24, CAD entry 19:53:15-19:53:52.
[22] Ex. A at 23, CAD entry 19:17:39 & 19:19:17.
[23] Ex. A at 23, CAD entry 19:34:36.
[24] Ex. A at 23, CAD entry 19:34:36; Ex. A at 7, Fifer Report p. 2.
[25] Ex. A at 23, CAD entry 19:25:51 (showing Perez – using number 11C1 - as on scene). Ofc. Perez's contact with Ms. Howell was recorded on audio found at Exhibit C-1 and C-2.
[26] Ex. C-1, Audio (BN 915) at :35-:48.

- Demott had come into the room and touched her baby on the face. Howell did not want him touching the baby because he was dirty and known to put things in the baby's mouth, so she told him to stop;[27]

- Demott told Howell not to tell him what to do and said that he could do whatever he wanted because it was his house;[28]

- Demott then cornered her in the kitchen.[29] That is, he walked aggressively towards her, was really angry and in her face. She used her hand to cover herself because she thought he was going to hit her;[30]

- Her father had previously hit her with a fake toy sword, gently but he had been so aggressive lately she did not know what would happen;[31] and

- Demott was bipolar and manic depressive, and Howell believed he was schizophrenic as well. He had been in and out of API.[32]

Ofc. Perez completed paperwork for an arrest warrant and a search warrant and presented it to the magistrate.[33] The magistrate granted both warrants.[34]

---

[27] Ex. C-1, Audio (BN 915) at :50-1:17; Ex. C-2, Audio (BN 917) at :05-:07.
[28] Ex. C-1, Audio (BN 915) 1:23-1:26; Ex. C-2, Audio (BN 917) at :10-:14.
[29] Ex C-1, Audio (BN 915) 1:27-1:30.
[30] Ex. C-1, Audio (BN 915) 1:40-2:17; Ex. C-2, Audio (BN 917) at :21-:23.
[31] Ex. C-2, Audio (BN 917) at :23-:38
[32] Ex. C-1, Audio (BN 915) at 2:44-3:12.
[33] Ex. D, Perez Deposition Tr. 31:20-32:10; Ex. E at 2-4, Criminal Complaint.
[34] *See* Ex. E at 1, Arrest Warrant, Case No 3AN-18-10570CR. The Search warrant is in the State court records at Case No. 3AN-18-3415 SW.

### D. SWAT call out

The SWAT team was called out because the situation met all the requirements.[35] The crisis negotiation team also responded.[36] A command center was set up away from the residence, where Soto and the negotiators remained throughout the call.[37] By about 9:30 pm SWAT had replaced all the officers on scene.[38]

The negotiators spoke to Howell and Charlie.[39] Through them, the negotiators learned that Demott did not have any means of communication; he had no wifi, cell phone or landline.[40]

### 1. SWAT Tactics employed.

SWAT utilized a number of approaches in an effort to get Demott to exit the residence peacefully.

### a. Announcements

Members of the SWAT team made announcements via loudspeaker so that they could be certain Demott heard them.[41] These announcements identified the officers as APD, advised Demott that there was a warrant for his arrest and a search warrant for his residence, and explained the various types of force that could be used, including Tasers,

---

[35] Ex. A at 3, Childers Report at p.1; Ex. G, Affidavit of Luis Soto at ¶ 5.
[36] Ex. A at 6-7 & 20-21, Fifer and Yoon Reports.
[37] Ex. G, Affidavit of Soto at ¶ 4.
[38] Ex. A at 26, CAD entry 21:39:04.
[39] Ex. A at 6-7 & 20-21, Fifer & Yoon reports.
[40] Ex. A at 7, Fifer Report p. 2; Ex H, Howell Depo Tr. 73:19-24.
[41] Ex. F, Affidavit of Steven Childers at ¶ 5.

projectiles, chemical irritants, and K9s.[42]  The announcements continued throughout the call out.[43]

### b.  Projectiles

Just before 11:00 pm, SWAT deployed "Knock-knocks."[44] Officers use knock knocks by firing projectiles (typically made of foam) to the exterior of a structure, such as doors, windows and walls.[45]  The primary goal of the knock-knock is to gain the attention of a barricaded suspect.[46]

After deployment of the projectiles, there were indications that Demott was in the residence.[47]  However, the knock-knocks did not cause Demott to exit the residence or otherwise cause him to communicate with APD.

### c.  Chemical Agents[48]

Next, the SWAT turned to chemical agents, the goal of which is provide an irritant to an individual inside in order to cause them to exit the structure.[49] Members of the SWAT team delivered chemical agents in two separate deployments.

---

[42] Ex. A at 3, Childers Report at p.1.

[43] Ex. A at 3, Childers Report at p.1.

[44] Ex. A at 27, CAD entries at 22:52:06-22:56:20.

[45] Ex. G, affidavit of Soto at ¶ 6b.

[46] *Id.*

[47] He was seen at the window. Ex. A at 27, CAD entries 23:07:41, 23:08:05 and 23:19:19.  There was also reported to be some sort of smoke or fog filling the back bedroom and loud banging. Ex. A at 28, CAD entries 23:21:13 & 23:33:08.

[48] These are also referred to in the reports as gas munitions or "CS gas," which is known as 2-chlorobenzylidene malononitrile.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1127513/ (visited 3/14/22).

[49] Ex. G, Affidavit of Soto at ¶ 6c.

A matter of minutes after the first deployment of chemical agents, "Mike" exited the house.[50] "Mike," who was identified as Michael Girardin ("Girardin"), told Officer Sears that he was unable to leave the home despite hearing the announcements because Demott had threatened to shoot him if he did.[51] Girardin also spoke to negotiators at the command center where he told them Demott might be hiding in the crawlspace.[52] Girardin confirmed Demott had weapons in the home.[53]

However, Demott did not respond in any manner to the first deployment of chemical agents. Accordingly, SWAT delivered a second round, introducing checmical agents into the garage, kitchen and crawlspace.[54]

Demott had not been seen since some time before the gas deployment, but after the knock-knocks were used.[55] There were no signs of any movement at all after Girardin left the residence. A scout team was unable to find any sign of Demott.[56]

### d. Entry into Residence.

SWAT made entry into the home in the early morning hours of November 6, 2018.[57] Breaching and entering a barricaded residence is only done as a last resort because of the

---

[50] Ex. A at 4, Childers Report at p. 2; Ex. A at 28, CAD entry 23:40:44.
[51] Ex. A at 18, Sears Report p. 2.
[52] Ex. A at 20-21, Yoon Report. The family was asked about the crawlspace, and they confirmed its location. Ex. A at 29, CAD entry 00:36:21.
[53] Ex. A at 20-21, Yoon report.
[54] Ex. A at 4, Childers Report p. 2; Ex A at 11, Lewis Report p. 1; Ex. A at 30, CAD entry 1:40:57.
[55] The last entry in CAD reporting seeing Demott is at 23:08:05. Ex. A at 27, CAD.
[56] Ex A at 4, Childers Report p. 2.
[57] Ex. A at 4-5, Childers Report p. 2-3; Ex A at 31, CAD entry 3:36:31.

dangers posed to officers and the suspect.[58]  However, having been on scene for many hours with no attempts by Demott to communicate, lacking any method for contacting Demott, and having not seen or heard any recent movements from within the residence, SWAT had no other options available with which to execute the arrest warrant.[59]

After the front door was breached, APD unsuccessfully deployed a robot.[60]  Next, K9 Alex entered the residence.[61]  K9 Alex was unable to locate Demott anywhere in the residence.[62]  Thereafter, a search team entered the residence.

After working through all the rooms in the house, team members located a cleared spot in the bedroom where there was a hatch, which was believed to be the entrance to the crawlspace.[63]  When they opened the hatch, they found Demott in the crawlspace largely submerged in water.[64]  He was deceased.[65]

APD detectives commenced and completed a death investigation. On December 12, 2018, the Medical Examiner issued a report finding the cause of death was drowning/hypothermia due to submersion of his body in the water in the crawl space.[66]

---

[58] Ex. G, Aff. of Soto at ¶ 8.
[59] Id.
[60] Ex. A at 4, Childers Report p. 2 (the robot got stuck).
[61] Ex. A at 31, CAD entry 3:36:31.
[62] Ex. A at 4, Childers Report at p. 2.
[63] Ex. A at 4, Childers Report at p.2.
[64] Ex. A at 5, Childers report at p.3; Ex. A at 10, Hernandez Report p.2; Ex. A at 31, CAD entry 4:13:57.
[65] Ex. A at 6, Childers report at p. 3.  Based on his condition, it was believed he had been there for some time.  Id.
[66] Ex. A at 8, Suppl. Report of Det. Henikman.

I.    **Fourth Amendment Unreasonable Seizure/Excessive Force**[67]

"[W]hen [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a seizure has occurred."[68] For purposes of this motion, the court should assume that a seizure did occur when police surrounded Demott's residence.

The Fourth Amendment prohibits only *unreasonable* seizure.  One way that a seizure can be unreasonable is through excessive use of force.  Whether a police officer uses excessive force to effectuate an arrest depends on amount of force used, balanced against government's need for intrusion as measured by the severity of the crime, whether the suspect posed an immediate threat to officer's or public's safety, and whether suspect was resisting arrest or attempting to escape.[69]

   **A. Qualified Immunity Standard.**

Qualified immunity shields government officials from civil liability when their actions do not violate clearly established statutory or constitutional rights.[70]  The goal is to achieve a balance between the "need to hold public officials accountable when they

---

[67] Although plaintiff lists these as two separate causes of action, the complaint does not identify different facts or theories. Complaint (lodged at Dkt. 4). Thus, it appears there is a single claim for excessive force.

[68] *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968).

[69] *Espinosa v. City and County of San Francisco*, 598 F.3d 528 (9th Cir. 2010) (citing *Graham v. Connor*, 419 U.S. 386, 396-97 (1989)).

[70] *Mattos v. Agarano*, 661 F.3d 443, 440 (9th Cir. 2011).

exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly."[71]

In determining whether a police officer is entitled to qualified immunity for federal claims, two questions are presented: "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case."[72] The court has discretion as to which of the questions should be addressed first.[73] This court should faithfully guard "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging vigorous exercise of official authority."[74]

Qualified immunity shields an officer from liability even if his action resulted from a "mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[75] Even if there is a violation, if an officer's use of force is premised on a reasonable belief that such force was lawful, the officer will be granted qualified immunity.[76]

---

[71] *Id.* (citations omitted).
[72] *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (reversed on other grounds).
[73] *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).
[74] *Harlow v. Fitzgerald,* 457 U.S. 800, 807 (1982) (citation omitted).
[75] *Pearson v. Callahan*, 129 S.Ct. at 815 (citation omitted).
[76] *Bryan v. McPherson*, 630 F.3d 805, 832 (9th Cir. 2010) (citations omitted).

Alaska usually follows federal case law with respect to qualified immunity.[77] Police officers in Alaska are entitled to qualified immunity in excessive force cases if the officer's conduct was objectively reasonable or the officer reasonably believed the conduct was lawful, even if it was not.[78]

### B. Plaintiff Fails to Identify the Specific Use of Force Challenged as Excessive.

Howell has not established that there was any intrusion by the named individual defendants. Soto, for his part, did not deploy projectiles or chemical agents.[79] In fact, he was not even at the residence. Throughout the entirety of the call out, he was at the command post located a few blocks away from the residence.[80]

Although Childers was present at the residence, Howell too has not identified which actions that he took - as distinguished from any other SWAT team members – that she believes constitute excessive force. Like Soto, Childers did not personally deploy any projectiles.[81] And although he personally deployed gas into the garage and the near the front door, there were many others who deployed gas in various locations as well.[82] But plaintiff has not offered any evidence as to why the specific instances of chemical agent deployment by Childers was excessive.

---

[77] *Russell v. Virg-In*, 258 P.3d 75, 806 (Alaska 2011); *Sheldon v. City of Ambler,* 178 P.3d 459, 463 (Alaska 2008).
[78] *Olson v. City of Hooper Bay*, 251 P.3d 1024.
[79] Exhibit G, Affidavit of Soto at ¶ 7.
[80] Ex. G, Affidavit of Soto at ¶ 4.
[81] Ex. F, Affidavit of Childers at ¶ 6.
[82] Ex. F, Aff. of Childers ¶ 7.

## C. Childers and Soto are Entitled to Qualified Immunity.

Assuming, however, that plaintiff identifies the uses of force by Childers or Soto, both are entitled to qualified immunity under the existing law.  In analyzing excessive force claim under the Fourth Amendment, the court asks whether the officer's actions were "'objectively reasonably' in light of the facts and circumstances confronting them."[83]  The officers' actions are to be evaluated from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight.[84]

### 1.   The Quantum of Force Was Relatively Low.

First, the court considers the "quantum of force – the type and amount of force" that was used.[85]  The force about which plaintiff complains is the use of projectiles and gas (chemical agents).[86]  Municipal Defendants admit that the SWAT team *as a whole* used projectiles as knock knocks and deployed chemical agents in this SWAT callout.

The application of the force in this case – projectiles and chemical agents – was relatively limited in nature.[87]  The projectiles were fired at the exterior of the residence – doors, walls, windows – in an effort to get Demott's attention.[88]  They are not and were not intended to cause pain. And there is absolutely no evidence that they came into contact

---

[83] *Bryan v. McPherson*, 630 F.3d at 823 (quoting *Graham v. Connor,* 490 U.S. at 397).
[84] *Graham v. Connor*, 490 U.S. at 396.
[85] *Bryan v. McPherson*, 630 F.3d at 823.
[86] Ex. I, Plaintiff's Resp to Interrogatory No. 3.
[87] *Bryan v. McPherson,* 630 F.3d at 825 (citations omitted) "rather than relying on broad characterizations, we must evaluate the nature of the specific force employed in a specific factual situation.")
[88] Ex. F, Aff of Childers ¶ 6.

with Demott.  Since the extent of injuries sustained from a use of force is relevant in evaluating the degree of force,[89] where there is no contact with a person or injury suffered as a direct result, three degree of force to be considered is reduced.

In this regard, courts consider chemical agents "intrusive" when they actually result in irritation causing someone to exit. [90]  Here, however, the chemical agents were intended to cause sufficient irritation to cause Demott to exit the residence.[91]  Again, there is no evidence that the chemical agents in fact caused any irritation to Demott.  After all, he did not respond in a manner consistent with having been affected since he did not exit the residence.  Since they did not have the intended effect, the chemical agents too should be considered less intrusive.

### 2.  The Government Interest Was Substantial.

Next, the court balance the uses of force against the government's interests examining three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[92]  In this case, compelling circumstances dictate that the government's interest in using force to make an arrest of Demott was substantial.

---

[89] *Bryan v. MacPherson*, 630 F.3d at 824-825 ("The presence of non-minor physical injuries… is certainly relevant in evaluating the degree of the Fourth Amendment intrusion.").
[90] *Bayer v. City of Simi Valley,* 43 Fed. Appx. 36, 38 (9th Cir. 2002). In no case would be they considered deadly force.
[91] Ex. G, Aff of Soto ¶ 6c.
[92] *Bryan v. McPherson*, 630 F.3d at 826 (quoting *Graham v. Connor*, 490 U.S. at 396).

The three core factors enunciated in *Graham v. Connor* all provide an objective basis for use of more significant force. Nevertheless, the SWAT team utilized limited force in its effort to effectuate a mandatory arrest in a high-risk situation.

### a. The Severity of the Crime – one of Domestic Violence- Was Compelling.

A magistrate issued a warrant for Demott's arrest for a crime – one of domestic violence.[93] As described above, Howell called 911 to report her father had ripped down the curtains in her bedroom and was barricading the house.[94] While she was cooking her father approached her infant son and was touching him. When she told him not to, he got very angry and approached her, cornering her. She shielded her face with her arm because she feared he was going to hit her.[95] Indeed, she noted that he had been so aggressive lately she simply did not know what he might do.[96]

Domestic violence is a serious crime. The seriousness of the crime is evident from Alaska Statute 18.65.530, which <u>requires</u> that officers make an arrest for domestic violence as follows:

> (a) …[a] peace officer, with or without a warrant, ***shall arrest*** a person if the officer has probable cause to believe the person has, either in or outside the

---

[93] *See* Ex. E at 1, Arrest Warrant (charges for Assault, Criminal Mischief and Resisting/interfering with Peace Officer).
[94] Ex. B-1, 911 Audio (BN 909) at :12-:18.
[95] Ex. C-1, Audio (BN 915) at :50-1:17 & 1:27-1:30 & 1:40-2:17; Ex. C-2, Audio (BN 917) at :05-:07 & :29-:33.
[96] Ex. C-2, Audio (BN 917) at :23-:38

presence of the officer, within the previous 12 hours: (1) committed domestic violence… whether the crime is a felony or a misdemeanor…[97]

Given the nature of the crime committed by Demott and the requirements of AS 18.65.030, the government interest in the use of force was elevated.

### b. Demott Posed an Immediate Threat to Officers and Others.

Officers reasonably believed that Demott presented an immediate threat to their safety and the safety of others and there were objective facts to support this belief.[98] Howell told Ofc. Perez she did not know what Demott would do given his recent aggressive behavior.[99] She had already told dispatchers that Demott had attacked police officers in the past.[100] Further, Demott was in possession of weapons. He was seen with a sword and a rifle[101] and family members told APD that there were additional weapons in the home.[102]

### c. Demott was Actively Resisting Arrest by Barricading.

With respect to the third factor, Demott was undoubtedly actively resisting arrest by barricading himself and covering the windows in an effort to obscure him from view.[103] It is undisputed that a barricaded subject poses a high-risk situation.[104]

---

[97](emphasis added). The version in effect in 2018 allows an exception only when "the officer has received authorization not to arrest from a prosecuting attorney in the jurisdiction in which the offense under investigation arose." AS 18.65.530(c) (2017).

[98] *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) (requiring objective factors to justify a concern for safety).

[99] Ex, C-2, Audio (BN 917) at :23-:38.

[100] Ex. A at 22, CAD entry 18:34:52; Ex. B-1, 911 Call (BN 909) at 1:18-1:38.

[101] Ex. A at 22-24, CAD entry 19:11:58, 19:17:39, 19:19:17 & 19:53:15-19:53:52.

[102] Ex. A at 23, CAD entry 19:34:36; Ex. A at 7, Fifer Report p. 2.

[103] Ex. B-1, 911 Call (BN 909) at :16-:19 (stating he's barricaded the front door); Ex. A at 24, CAD entry 19:41:35.

[104] Ex. J, Scanlon Rebuttal Report at p. 4.

### 3. Officers Reasonably Believed the Actions they took Were Lawful.

Even if the court does not find Childers and Soto are entitled to summary judgment on the Fourth Amendment excessive force claim, they are entitled to qualified immunity because they reasonably believed any actions they took were lawful. AS 11.81.370(a) allows police officers to use nondeadly force (or threaten to use nondeadly force) when and to the extent the officer reasonably believes it necessary to make an arrest. And AS 18.65.030 required officers to arrest Mr. Demott.

Meanwhile, no case law that would have put them on notice that use of projectiles to gain attention of a barricaded suspect or deployment of chemical agents as an irritant to try to effect the arrest of a barricaded suspect who is wanted on a domestic violence warrant would be unlawful. And there is no case that would have put them on notice that taking these actions even when the suspect has a mental illness would be unlawful.

In fact, the case law would lend support to an officer's belief that use of SWAT tactics, including chemical agents, on a mentally ill barricaded suspect is reasonable. For example, in *Bayer*, the court concluded it was reasonable for police, "following four hours of armed standoff and failed negotiations" with a mentally unstable suspect "to use non-lethal force to extricate a subject who has shot at police and refuses to surrender." Although Demott never fired a weapon at APD, he had weapons in the home with him. Further, he reportedly threatened to shoot officers who approached the residence in the initial

response.[105]   He then proceeded to engage in a multi-hour standoff despite a warrant being issued for his arrest after he committed an act of fear assault on his daughter.

Given the mandatory arrest provision of AS 18.65.530, the presence of weapons in Demott's home, the threats Demott had made, and the inability to communicate with him, any reasonable officer would have believed they could use non-deadly levels of force directed at getting his attention and causing him to exit the residence.

## II.   *Monell* Claims against MOA

Plaintiff has asserted *Monell* claims against the Municipality of Anchorage.[106] There is no vicarious liability for claims arising under 42 U.S.C. § 1983.[107] To establish a §1983 municipal liability claim, plaintiff must prove (1) violation of federal right that is (2) attributable to a municipal policy or practice.[108]  Without an underlying constitutional violation, there can be no *Monell* claim.  Accordingly, if this court concludes that there was no violation of plaintiff's Fourth Amendment constitutional right, there can be no separate municipal liability.

Even if the court does not grant summary judgment to individual defendants on the excessive force claim, the Municipality is entitled to summary judgment on any of the asserted *Monell* claims.  To prevail on the *Monell* claims, plaintiff must prove (1) plaintiff's

---

[105] Ex. A at 22, CAD entry 19:13:40.

[106]  Complaint (Dkt. 4) ¶ 55.

[107] *Monell v. Dept. of Soc. Servs., New York City*, 436 U.S. 658, 694-95 (1978).  Vicarious liability may be available for constitutional violation arising under state law.  But if there is no state law constitutional violation, there is no basis for negligence claim against the MOA/APD.

[108] *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

constitutional rights were violated; (2) the municipality had a custom or practice in place that amounted to deliberate indifference; and (3) that custom or practice was the moving force behind the constitutional violation.[109] The Ninth Circuit recognizes several categories of "official municipal policy," including an action pursuant to a longstanding custom or practice, ratifications of an employee's action by a final policy maker and a failure to adequately train and supervise.[110]

The evidence shows that APD has a CIT program and that numerous officers who responded to the scene were CIT trained.[111] Both Soto and Childers were aware of Demott's reported mental illness and had attended CIT training in some form.[112] There has been no evidence presented that Officer Childers and Sergeant Soto were anything other than properly trained and supervised in their role. And there has been no evidence that any other officer was not properly trained or supervised.

The evidence does not establish deliberate indifference or that a custom or practice was the moving force behind a constitutional violation. Nor is there any evidence of a pattern of constitutional violations that would have alerted MOA that its training or supervision was inadequate.

---

[109] *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).
[110] *Christie v. Iopa*, 176 F.3d 1231,1235-1240 (9th Cir. 1999); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989)
[111] APD's CIT program is discussed on its public website. www.anchoragpolice.com/cit (last visited 3/15/22) and numerous officers on scene were CIT certified and trained officers. Exhibit M, MOA Resp to Interrogatory No. 3.
[112] Ex. F, Aff, of Childers ¶ 8; Ex. G, Aff. of Soto ¶ 5, 9.

### III.    State Negligence Claim.

Howell asserts that APD's officers negligently failed to use "reasonable de-escalation techniques" when they attempted to arrest Demott.[113]  "To make out a prima facie case of negligence," a plaintiff must "present evidence on each of the following elements: duty, breach, proximate cause and damages."[114] Howell does not and cannot meet her burden of establishing a prima facie case.

### A.    Howell Cannot Establish a Duty To "De-Escalate".

When asked to state all facts that support her claim that the defendants improperly failed to de-escalate, Howell's unsigned answer to the interrogatory was to "See response to Interrogatory 3".[115]  In turn, her unsigned answer to Interrogatory 3 was as follows:

> Objection.   Foundation and to the extent seeking information protected by attorney client privilege and/or attorney work product doctrine.  Without waiving objections, Defendants escalated force and made a violent and chaotic situation by shooting tear gas and projectiles into the house instead of helping my father who was mentally ill and in distress.  Discovery is just beginning and Plaintiff reserves the right to supplement this response with expert review.[116]

No supplement was ever provided.  Instead, Howell's expert, Dennis Waller, shed further light on the plaintiff's claim.  In Waller's opinion, the "crux" of the matter is that although it may have been appropriate for an arrest warrant to have been issued for Demott, he

---

[113] Complaint (Dkt. 4) at ¶ 59.
[114] *Lindsey v. E & E Automotive & Tire Service, Inc.*, 241 P.3d 880, 885 (Alaska 2010).
[115] Ex.I, Pla's Resp to Int. 4.  Interrogatory 3 had asked the plaintiff to "State all the facts that support your claim that 'defendants used excessive force when arresting Dan Demott in Anchorage, Alaska, causing serious injury and his death'.  (See paragraph 58 of plaintiff's Complaint)."
[116] Ex. I, Pla's Resp. to Int. 3.

believes it was a violation of the standard of care for the police to actually attempt to arrest him on the night that they did.[117]  According to Waller, the police had a duty to avoid a law enforcement response (i.e. attempting an arrest) because, in his view, the standard of care requires that police instead "deal with the issue of him being mentally ill".[118]

In this case, a court had issued a warrant for Demott's arrest for his acts of domestic violence – conduct that directly precipitated Demott's standoff with the police.[119]  The police attempted to execute that arrest warrant, and Demott was actively resisting arrest. In doing so, he was brandishing a sword and a firearm,[120] was actively barricading himself within a building that contained other guns, and was covering the windows in an effort to conceal his whereabouts and actions from the police.[121]  Girardin, who was with Demott in the residence, reported that he did not exit the residence sooner than he did because Demott threatened to kill him if he attempted to leave.[122]  Even if one was to discount the domestic violence that occurred at the outset, coupling the fact of a barricaded suspect with the plaintiff's warning that Demott was known to attack police officers [123] and with

---

[117] Ex. L, Waller Depo. Tr. 66 – 73; *see also* Waller Depo Tr. 55 – 65.
[118] Ex. L, Waller Depo Tr. 75.
[119] Ex. E at 1, Arrest Warrant.
[120] Ex. A at 22, CAD entry 19:11:58. He was later seen again with the sword. Ex. A at 23-24, CAD entries 19:17:39, 19:19:17 & 19:53:15-19:53:52.    It was unclear to officers on the scene if the firearm was a BB gun or something more lethal and only later were advised it was believed to be a BB gun. Ex. A at 23, CAD entry 19:34:36.
[121] Ex. B-1, 911 Call (BN 909) at :16-:19 (stating he's barricaded the front door); Ex. A at 24, CAD entries 19:41:35; Ex. A at 23, CAD entry 19:34:36; Ex. A at 7, Fifer Report p. 2 (learning from Charlie about presence of guns in residence).
[122] Ex. A at 18, Sears Report p. 2.
[123] Ex. B-1, 911 Audio (BN 909) at 1:18-1:38.

Girardin's report of a threat against his life,[124] meant that the safety of others was in jeopardy. Any objectively reasonable officer would have believed that it was appropriate to use non-deadly force and/or to threaten to use force to effectuate the arrest of Demott.[125] Indeed, the Ninth Circuit Court has held in a similar situation that it was objectively reasonable for police to use tear gas to extricate a barricaded subject, without regard for the fact that he was "mentally disturbed".[126]

"Whether a party has a duty of care and, if so, the nature and scope of that duty are questions of law."[127] "An assumption of duty may be discerned if the government has adopted regulations or standards requiring it to act in a certain way."[128]

Under Alaska law, an "officer may use nondeadly force and ... threaten to use deadly force when and to the extent the officer reasonably believes it necessary to make an arrest".[129] Here, a court had issued a warrant for Demott's arrest for domestic violence.[130] The domestic violence had occurred less than 12 hours earlier.[131] AS 18.65.530(a)(1) provides that "A peace officer, with or without a warrant, **_shall_** arrest a person if the officer has probable cause to believe the person has, either in or outside the presence of the officer, within the previous 12 hours: (1) committed domestic violence . . . whether the crime is a

---

[124] Ex. A at 18, Sears Report at p.2.
[125] *See Graham v. Connor*, 490 U.S. at 395; *see* Aff. of Childers ¶8.
[126] *Bayer v. City of Simi Valley*, 43 Fed. Appx. 36.
[127] *Lindsey v. E & E Automotive & Tire Service, Inc.,* 241 P.3d 880, 885 (Alaska 2010).
[128] *Barton v. City of Valdez,* ___ P.3d ___, Slip Op. S-17691 (Alaska January 21, 2022).
[129] AS 11.81.370(a).
[130] Ex. E at 1, Arrest Warrant.
[131] Ex. A at 22, CAD (reflecting call at 18:34:02 on November 5, 2018).

felony or a misdemeanor".[132]

In light of the instruction provided to law enforcement in AS 18.65.030, Howell is simply wrong to assert a contrary duty to pursue "non-law enforcement options" instead of attempting an arrest.

## B. There Was No Breach.

Howell characterizes the alleged breach as "shooting tear gas and projectiles" at the building in which Demott was barricaded "instead of helping my father who was mentally ill and in distress".[133] As characterized by Howell's expert, the police acted appropriately by getting a warrant[134] and were not negligent just by virtue of attempting an arrest,[135] but were negligent because they attempted to communicate to Demott – who would not come to the door and had no phone – via loudspeaker.[136] Specifically, the claim is that the police failed to meet their duty because they should "not threaten the individual with arrest" and because they should adopt "a calm, measured approach; not – not being loud, not giving orders.[137] Additionally, it is alleged that the police failed to meet their duty because they employed a SWAT team instead of a psychiatrist,[138] because SWAT team members don't

---

[132] AS 18.65.530(a)(1) (emphasis added).
[133] Ex. I, Pla's Resp. to Int. 3, 4.
[134] Ex. L, Waller Depo. Tr. 57.
[135] Ex. L, Waller Depo Tr. 58.
[136] Ex. L, Waller Depo. Tr. 96.
[137] Ex. L, Waller Depo. Tr. 61, 65.
[138] In addition to claiming that the police should have used a psychiatrist instead of a SWAT team, Howell asserts that the police failed to obtain assistance from Demott's friends and family members. However, Howell can't identify a single person from whom the police should have sought help. Ex. I, Pla's Resp. at Interrogatory 2.

"have that level of insight and experience and – and training that a psychiatrist would".[139] In short, in an amazing example of Orwellian doublespeak, the plaintiff asserts that the duty was breached because the police "stayed with the enforcement approach" instead of employing "alternatives" to attempting an arrest.[140]

The law is clear that the plaintiff is wrong. Where the plaintiff characterizes every aspect of the conduct of the APD officers as "excessive force", it must be recognized that police officers "are not required to use the least intrusive degree of force possible".[141] "Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue" when determining "whether the force that was used to effect a particular seizure was reasonable". Id.

The bottom line in this case is that the police had an requirement to effectuate an arrest.[142] It would have been a breach of their standards if they had simply gave up on an attempt an arrest in order to pursue "alternatives" as suggested by the plaintiff. There was no breach of the police department's duty, and the defendants are entitled to judgment as a matter of law.

---

[139] Waller Depo. at 54. Howell called APD for assistance.
[140] Ex. L, Waller Depo. Tr. 51, 55.
[141] *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).
[142] AS 18.65.530(a)(1).

## C.  There Is No Proximate Cause.

Demott tragically died on the night that APD attempted to arrest him, by drowning/hypothermia in standing water in the crawl space beneath his residence.[143] Nobody knows when it was that he died.  Nobody knows why.  The police had absolutely no contact or interaction with Demott that night, as he had barricaded himself in his house with no way to communicate directly with him.  He was last seen by the police at 11:08 p.m. and he was reported to be alive at 11:40 p.m. when Girardin left the house.[144]  He was found dead in the crawl space at 4:13 a.m.[145]

Girardin told negotiators that he believed Demott was hiding in the crawl space when he left the house at 11:40, seconds after the police had deployed chemical agents into the garage through a previously broken window at 11:39 p.m.[146]  If Girardin's report was true, it cannot be stated with any degree of certainty that Demott entered the crawl space as a result of "chemical agents" being "introduced", as the plaintiff has claimed.[147]  Nor is it possible for anyone to state with any scientific certainty that Demott's decision to enter the crawl space was a causal result of the use of "knock-knocks" by the police, since Demott was seen at the window of his house at 11:07 and 11:08 p.m. - after the knock-

---

[143] Ex A at 8, Henikman Suppl. Report (re cause of death).
[144]  Ex A at 4, Childers Report at p. 2; Ex. A at 28, CAD entry at 23:40:44. Girardin was subsequently investigated for Demott's murder. Ex. A at 18-19, Sears Report pp.2-3 (informed Girardin was a suspect and transported him to APD for questioning).  Whether or not a murder occurred is still an unanswered question, but accidental death is currently presumed.  Ex. A at 8, Henikman Suppl. report (listing manner of death as accidental).
[145] Ex. A at 31, CAD entry 4:13:57.
[146] Ex A at 20-21, Yoon Report; Ex. F, Aff. Childers ¶7.
[147] *See* Ex. K, Waller report at p. 8.

knocks were deployed.[148]

Simply put, there is absolutely no evidence of any kind that APD caused any injury to Demott.[149]  There is no evidence that he was affected by the use of loudspeakers, knock-knocks, gas, or any of the tactics or tools used by the police in their efforts to establish contact and effectuate an arrest.  No evidence at all shows that Demott's death was a result of actions taken by the police.

Howell presents only supposition and speculation to claim that the police caused Demott's death.[150]  But theories of causation "must not be too conclusory, too speculative, or too incredible to be believed."[151]  Indeed, the law requires that when a connection between a defendant's conduct and a plaintiff's injury is not readily apparent to a lay person relying on every day experience, the opinion of a medical expert is required to establish such a connection.[152]  However, Howell has no such medical expert.  Accordingly, plaintiff cannot establish proximate cause and Municipal Defendants are entitled to summary judgment.

### D.    Damages.

Damages are separately addressed more fully below.  Like every other aspect of the plaintiff's case, there simply are none.

---

[148]  Ex. A at 27, CAD entries 23:07:41- 23:08:05
[149]  Ex. I, Plaintiff's Resp to Interrogatory 8.
[150]  *Id.; see* Complaint (Dkt. 4).
[151]  *Culliton v. Hope Community Resources*, 491 P.3d 1088, 1096 (Alaska 2021).
[152]  *Id.*

Howell does not present a prima facie case of negligence. The defendants are entitled to summary judgment, and Howell's illusory claim of negligence should be dismissed.

## E. The Municipality Is Not Liable for Either Negligent Training or Negligent Supervision.

According to the Complaint, "The defendants are liable for negligent training and/or supervision which was a substantial factor in causing harm to Dan Demott".[153] Further, the Complaint asserts that the harm to Demott took the form of "great physical, emotional injury and death".[154] But nowhere does the plaintiff offer any clue as to what training may have been missing, inadequate, or inappropriate.[155] When asked for all facts that support the plaintiff's claims that the defendants caused Demott to "suffer great physical, emotional injury and death," plaintiff disclosed no facts to suggest that there is or was any missing, inadequate, or inappropriate training.[156]

Similarly, the Complaint offers no clue as to which individuals may have negligently supervised others, or which individuals were negligently supervised by others.[157] Nor is the information revealed elsewhere. There has been no disclosure in this litigation as to exactly what the supervisory shortcomings may consist of, including

---

[153] Complaint (Dkt. 4) at ¶ 76.
[154] *Id*. at ¶ 71.
[155] The Complaint seeks "improved" training and/or policies and/or procedures regarding crisis situations (Complaint (Dkt. 4) at ¶ 82) but does not specify what improvements or shortcomings there are.
[156] Ex. I, Plaintiff Resp. to Int. 8.
[157] *See* Dkt 4.

whether they take the form of Municipal policy or individual malfeasance. Once again, when asked for all facts that support the plaintiff's claims that the defendants caused Demott to "suffer great physical, emotional injury and death", the plaintiff disclosed absolutely no facts to suggest that there is any inadequate, or inappropriate supervision that was a factor (substantial or otherwise) in causing harm to Demott.[158]

Where the plaintiff has no facts in support of her claim, "there can be no genuine issue as to any material fact," and "the moving party is entitled to a judgment as a matter of law".[159] Judgment must be entered in favor of the defendants on the negligent training and/or negligent supervision claim(s) accordingly.

## IV. Damages

### A. Pecuniary Damages.

#### 1. Accumulation to the Estate.

It is well established that the appropriate measure of damages to the estate is "the amount the decedent would have probably saved had []he not died prematurely."[160] However, plaintiff has provided no evidence to demonstrate there would have been any accumulation during Demott's lifetime had he not died on November 5 or 6, 2018. [161]

---

[158] Ex. I, Plaintiff resp. to Interrogatory 8.
[159] *Celotex*, 477 U.S. at 322-323. Because there are no facts identified to support these claims it is impossible for the Municipality to determine whether immunity may be appropriate.
[160] *Kulawik v. ERA Jet Alaska,* 820 P.2d 627, 631 (Alaska 1991).
[161] Plaintiff has provided no evidence concerning the residence that Ms. Howell believed he owned at the time of his death. *See* Ex. I, Pla. Resp to Interrogatories. Thus, there is no evidence that the value of the residence would have been an accumulation to the estate.

Plaintiff has not retained an economist to assist in calculating the accumulation to the estate. Plaintiff has provided no tax returns or other documents that demonstrate Demott's earnings. And Howell had no specific information about his earnings or tax records even though she believed he had previously filed them.[162] In fact, she was not entirely certain of his income.[163] In sum, she did not know anything about his finances aside from her belief that he received enough to pay the bills and the mortgage.[164]

In any event, Howell's testimony demonstrates that more likely than not there would not have been any accumulation during Demott's lifetime. She estimated his monthly income (although she was just guessing) at $1200-2000.[165] She believed there was rent or mortgage to be paid.[166] Although she admitted she did not have any specific knowledge of his finances, she believed he brought in enough to pay the bills.[167] But she was certain that he did not have any extra each month.[168] Thus, even if her uncertain and speculative statements about his income and expenses were sufficient evidence upon which to demonstrate income and expenditures, it only supports the conclusion that any income he had would have been depleted, resulting in no accumulation to the estate.

---

[162] Ex. H, Howell Depo. Tr. 19:19-20:16.
[163] Ex. H, Howell Depo Tr. 17:24-18:1.
[164] Ex. H, Howell Depo Tr. 18:2-16.
[165] Ex. H, Howell Depo Tr. 18:8-9.
[166] Ex. H, Howell Depo Tr. 18:25-19:1.
[167] Ex. H, Howell Depo Tr. 18:10.
[168] Ex. H, Howell Depo Tr. 19:2-11.

## 2. Howell is Not Entitled to Loss of Support Under Wrongful Death Statute.

Instead of seeking damages typically awarded, Howell seeks $1500 a month to her claiming Demott provided support in that amount.[169] As best defendants can tell, she is seeking these damages under the wrongful death statute, AS 9.55.080. That statute does allow for the recovery of loss of support. However, in *Millo v. Delius*, this court expressly held that in order for someone other than a surviving spouse or minor child to recover under the wrongful death statute they must establish dependency such that the death will result in financial loss.[170]

Howell is not entitled to recover for loss of support under the wrongful death statute since cannot establish dependency. Howell has not provided any evidence that Demott provided her with any regular financial support. Indeed, she was clear that he brought in only enough to pay his bills and nothing more.[171] Thus, he would not have had any additional funds to provide to her.

She did testify that she lived with Demott from approximately the age of 22 up until the time of his death.[172] But her testimony shows that she, in fact, suffered no financial loss of the "support" she claims. After her father's death, Howell simply moved in with her boyfriend, who pays the rent.[173] Her decision to reside with her father instead of her

---

[169] Ex. I, Pla. Resp Int. No. 9.
[170] 872 F.Supp.2d at 878-879.
[171] Ex. H, Howell Depo Tr. 19:2-11.
[172] Ex. H, Howell Depo Tr. 14:24-15:9.
[173] Ex. H, Howell Depo Tr. 27:11-14, 29:10-24

boyfriend is not adequate to demonstrate dependency for purposes of recovery under the wrongful death statute.

**B.    Plaintiff is Not Entitled to Pain & Suffering Damages Under Survival Statute.**

Under AS 9.55.570 a survival action permits compensation for pain and suffering between an injury and death.  "[N]o award should be made for any pain and suffering 'substantially contemporaneous with death or mere incidents to it.'"[174]

Plaintiff has no evidence to support an award of any pain and suffering damages. There is no evidence in the record concerning the sequence of events that occurred inside the home, particularly after Girardin exited the residence.  There is simply nothing that tells us exactly when Demott went into the crawlspace or why he went into the crawlspace. So we cannot know how long Demott was in the crawlspace before he died.  All we know is that he died in the crawl space of hypothermia/drowning.[175]

Plaintiff has not retained any expert to offer testimony that would provide some basis for an award of pain and suffering.  Given the lack of any evidence whatsoever on this subject, there can be no recovery of pain and suffering damages under AS 9.55.570.

---

[174] *Millo v. Dellius*, 872 F.Supp.2d at 875 (citations omitted).
[175] Ex. A at 8, Henikman Suppl. Report.

**C.      Howell is Not Entitled to Loss of Consortium.**

Minor children may bring a loss of consortium claim.[176]  But non-dependent adult children are not authorized to bring a loss of consortium claim for the death of a parent under the wrongful death statute.[177]

Plaintiff has identified no statutory beneficiaries who would be entitled to recover loss of consortium damages.  And, as discussed above,[178] Howell has failed to provide evidence of dependency sufficient to allow her to recover such damages under the statute.

Accordingly, plaintiff is not entitled to recover any damages for consortium damages as a matter of law.

## CONCLUSION

For the foregoing reasons, Municipal Defendants' motion should be granted and judgment should be entered in their favor.

---

[176] *Hibpshman v. Prudoe Bay Supply, Inc.*, 734 P.2d 991, 994 (Alaska 1987).
[177] *Millo v. Delius*, 872 F.Supp.2d at 876-877.
[178] Section IV.A.2, *supra.*

Respectfully submitted this 16th day of March, 2022

PATRICK N. BERGT
Municipal Attorney

By:    s/Pamela D. Weiss
        Pamela D. Weiss
        Alaska Bar No. 0305022
        Assistant Municipal Attorney
        Blair M. Christensen
        Alaska Bar No. 0311088
        Assistant Municipal Attorney
        Municipal Attorney's Office
        P.O. Box 196650
        Anchorage, Alaska 99519-6650
        Phone: (907) 343-4545
        Fax: (907) 343-4550
        E-mail: uslit@muni.org

Certificate of Service
The undersigned hereby certifies that on 03/16/22, a
true and correct copy of the foregoing was served on:

Jeffrey J. Barber

by first class regular mail, if noted above, or by electronic
means through the ECF system as indicated on the Notice
of Electronic Filing.

/s/ Cathi Russell
Cathi Russell, Legal Secretary
Municipal Attorney's Office