# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

KELSEY HOWELL, as P.R. for
Estate of Dan Demott, Jr.,

                Plaintiff,

      v.

MUNICIPALITY OF ANCHORAGE,
*et al.*,

                Defendants.

Case No. 3:20-cv-00301-SLG

## ORDER RE MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 25 is Defendants Municipality of Anchorage (Municipality), Luis Soto, and Steven E. Childers' motion for summary judgment. Plaintiff Kelsey Howell responded in opposition at Docket 36, and Defendants replied at Docket 41. Oral argument was held on June 7, 2022.

## BACKGROUND

This is a tragic case about the death of Dan Demott. The incident began on November 5, 2018, when Kelsey Howell and her father, Demott, got in an argument because Demott touched Howell's baby's face. Howell did not want Demott touching her baby's face because his hands were dirty. Demott got "really angry," and he "cornered" Howell. She put her hand in front of her face for fear that he would hit her.[1] Howell called 911 at approximately 6:30 p.m. and informed

---

[1] Docket 25-1 at 15–16.

the dispatcher that Demott was "crazy," barricading the front door, "ripping the curtains" down, and experiencing delusions that the police were watching him.[2] She said that he needed to go to the Alaska Psychiatric Institute (API). Howell told the dispatcher that Demott was diagnosed with bipolar disorder and manic depression and had been to API before, but he was refusing to take his medication.[3] She also warned the dispatcher that Demott may not cooperate with the police because he had attacked the police on one prior occasion approximately four or five years prior.[4]

When the police arrived, officers observed Demott through a window with a sword and what they initially thought was a rifle, although officers later said that they were "confident it[] [was] a BB gun."[5] Howell was able to safely exit the residence with her children.[6] Howell's brother, Justin Charlie, was also outside the residence.[7] A man named Michael Girardin, however, remained in the residence with Demott.[8] Girardin was homeless, and Demott had previously offered to let

---

[2] Docket 25-1 at 22; Docket 36-8 at 2–3.

[3] Docket 36-8 at 2–3.

[4] Docket 25-1 at 22; Docket 36-8 at 3.

[5] Docket 25-1 at 22–23.

[6] Docket 25-1 at 15.

[7] Docket 25-1 at 7.

[8] Docket 25-1 at 7.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 2 of 61

him stay at his residence in exchange for mechanical help.[9]

At approximately 7:30 p.m., Charlie informed the police that his father had a sword and a BB gun.[10] In addition, there was a .22 rifle and .22 handgun locked in a safe inside the house, but Charlie said that his father had lost the key to the safe and likely would not be able to find it because the residence was "extremely messy."[11] Charlie also told the police officers that the residence did not have a landline or Wi-Fi and that Demott did not have a cell phone.[12] At approximately 7:40 p.m., the Computer Aided Dispatch entry states that the police began making several announcements to the residence.[13]

The police obtained a search warrant of the residence and an arrest warrant of Demott.[14] The arrest warrant charged Demott with three violations of municipal law.[15] First, Demott was charged with "Assault – Fear of Imminent Injury" because "by words or other conduct, [he] recklessly place[d] . . . [Howell] in fear of imminent physical injury" in violation of Anchorage Municipal Code 8.10.010(B)(3). Second, he was charged with "Crim[inal] Mischief 5 – Property Damage" because he

---

[9] Docket 25-1 at 21.

[10] Docket 25-1 at 7, 23.

[11] Docket 25-1 at 7.

[12] Docket 25-1 at 7.

[13] Docket 25-1 at 24.

[14] Docket 25-1 at 15.

[15] Docket 25-5 at 1.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 3 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 3 of 61

"recklessly or intentionally injure[d] or destroy[ed] . . . real or personal property" in violation of Anchorage Municipal Code 8.20.010.A.6.[16] Third, he was charged with delaying or obstructing his arrest by barricading himself in his home in violation of Anchorage Municipal Code 8.30.010.A.3.[17] The warrant classified the event as a domestic violence incident.[18]

At approximately 8:20 p.m., a Special Weapons and Tactics (SWAT) team began to arrive at the scene.[19] Both of the named Defendants in this case were part of this SWAT team and arrived at that time.[20] Defendant Soto was a sergeant at the time whose role was to "coordinate and supervise the tactics implemented by SWAT." However, Soto "did not oversee SWAT's implementation of any tactics until they were approved and directed by the SWAT commander." Soto remained at the command center, which was located a few blocks away from the residence, throughout the entire incident and "did not personally make the announcements, fire projectiles or deploy chemical agents."[21]

Defendant Childers was a sergeant at the time of the events described in

---

[16] Docket 25-5 at 2.

[17] Docket 25-5 at 3.

[18] Docket 25-5 at 2.

[19] Docket 25-1 at 25. By 9:30 p.m., the SWAT team had replaced all the officers at the scene. Docket 25-1 at 26.

[20] Docket 25-1 at 25.

[21] Docket 25-7 at 2–3, ¶¶ 4, 7.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 4 of 61

this lawsuit. He was the "arrest team/entry team leader," meaning that he was to "guide and control the actual arrest of the suspect as safely as possible if they exit[ed]." However, he did "not make the decisions as to which SWAT tactics to use or when to use them." Like Soto, he did not personally make any of the announcements or deploy projectiles, but he did introduce chemical agents.[22]

The SWAT team made announcements via a loudspeaker, identifying themselves as the Anchorage Police Department (APD). The SWAT team also informed Demott over the loudspeaker that there was a warrant for his arrest and a search warrant for his residence. The SWAT team warned that it would use lethal or non-lethal force against Demott, including tasers, direct impact munitions, gas, and K9s.[23]

Just before 11:00 p.m., the SWAT team deployed baton rounds and "knock-knocks."[24] Knock-knocks are "foam projectiles" that are deployed "against the structure in order to gain the attention of the suspect."[25] The baton rounds were used to break a large window by the front door. The SWAT team then made more announcements and, after receiving no response, deployed additional, "less lethal rounds to hit the main entrance door and garage man door as agitation."[26]

---

[22] Docket 25-6 at 2, ¶¶ 3, 5–7.

[23] Docket 25-1 at 3.

[24] Docket 25-1 at 27.

[25] Docket 25-7 at 3, ¶ 6(b).

[26] Docket 25-1 at 3–4.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 5 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 5 of 61

According to the Computer Aided Dispatch report, an officer saw Demott at a window just after the second deployment at approximately 11:00 p.m.; this was the last time that Demott was reportedly seen alive. There is no indication that Demott had a firearm at that time; he was noted to have moved away from the window.[27] Shortly after 11:30 p.m., there was a report of loud banging coming from inside the residence.[28]

Minutes later, at 11:36 p.m., the SWAT team deployed its first round of chemical agents.[29] These were placed "inside the residence and attached garage in order to create an irritant sufficient to cause the barricaded suspect to exit the structure."[30] Childers successfully deployed a baffled Carbon Monosulfide (CS) grenade through the window near the main entrance door.[31] Minutes after the first round of chemical agents was deployed, Girardin exited the residence. He had not been harmed by Demott.[32] Shortly after Girardin left the residence, Childers deployed another baffled CS grenade into the garage because the first attempt had deflected off a window.[33]

---

[27] Docket 25-1 at 27.

[28] Docket 25-1 at 28.

[29] Docket 25-1 at 28.

[30] Docket 25-1 at 4; Docket 25-7 at 3, ¶ 6(3).

[31] Docket 25-1 at 4.

[32] Docket 25-1 at 4, 7, 18–19, 28.

[33] Docket 25-1 at 4.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 6 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 6 of 61

Girardin spoke to at least two officers after he left the home about what had happened in the residence, but his report is inconsistent. For example, Girardin informed the officers that he did not hear the officers calling his name because he had taken a couple of DayQuil pills.[34] However, he also said that he did not leave the residence because Demott threatened to shoot him if he left.[35] But he also told the police that he did not see any weapons in the home, except that he knew that Demott had BB guns and that when the police broke the windows, Demott had two swords but then dropped them.[36] Girardin further told police that Demott was experiencing a Vietnam flashback.[37] Additionally, Girardin informed the police that he believed that Demott was going into the crawl space.[38]

Throughout this time, the SWAT team continued to deploy additional rounds of tear gas into the residence but did not see any movement in the house.[39] Additional rounds of tear gas were fired between 1:00 a.m. and 2:00 a.m., including directly into the crawl space.[40] In these rounds of deployment, Childers launched tear gas into the garage man door window that had been previously broken. The

---

[34] Docket 25-1 at 21.

[35] Docket 25-1 at 18.

[36] Docket 25-1 at 21.

[37] Docket 36 at 9; Docket 36-2 at 13.

[38] Docket 25-1 at 21.

[39] Docket 25-1 at 29.

[40] Docket 25-1 at 29-30.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 7 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 7 of 61

SWAT team made more announcements. At approximately 2:00 a.m., the SWAT team decided to enter the residence. Childers was one of the SWAT team officers who entered the residence. The SWAT team looked for Demott using a robot, a K-9 police dog, and a pole-cam.[41]

The SWAT team found Demott's body submerged in water inside the crawl space at approximately 4:15 a.m.[42] According to the autopsy report, Demott died from either hypothermia or drowning. The ambient air temperature in the crawl space when he was found was 15 degrees Fahrenheit. He had "abrasions and contusions of flexor surfaces of extremities and on trunk," but the report concluded that the "trauma [was] insignificant to cause death." His death was classified as an accident.[43]

On November 4, 2020, Howell initiated this action in Alaska state court. With respect to Soto and Childers, Howell brings a claim pursuant to 42 U.S.C. § 1983, alleging that these Defendants used excessive force when attempting to arrest Demott, violating Demott's Fourth Amendment right under the United States Constitution to be free from unreasonable seizure.[44] Howell maintains further that these Defendants "violat[ed] the rights of Dan Demott to be free from unreasonable

---

[41] Docket 25-1 at 4.

[42] Docket 25-1 at 31.

[43] Docket 25-1 at 8.

[44] Docket 4 at 12, ¶¶ 67–68.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 8 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 8 of 61

seizure guaranteed by the Alaska Constitution . . . ."[45]  Howell also alleges in the complaint a state negligence claim for failure to exercise reasonable care and failure to use reasonable de-escalation techniques when executing the arrest warrant.[46]

With respect to the Municipality, Howell alleges that the Municipality is vicariously liable for the violation of Demott's Fourth Amendment right under the United States Constitution and for the violation arising under the Alaska Constitution.[47]  Howell also contends that the Municipality is vicariously liable for the negligence of its employees and directly liable for inadequately training or supervising its employees.[48]

Defendants removed the case to federal court.[49]  The parties conducted discovery, and the deadlines for discovery and pre-trial motions have now all passed.[50]  Defendants filed a motion for summary judgment, which is now before the Court for determination.[51]

---

[45] Docket 4 at 12, ¶ 68.

[46] Docket 4 at 11, ¶¶ 57, 59–62.

[47] Docket 4 at 11, ¶ 55; 12, ¶ 68.

[48] Docket 4 at 11, ¶ 55; 13, ¶ 76.

[49] Docket 1.

[50] Docket 13 at 4 ("Fact discovery shall be completed on or before January 15, 2022."); Docket 23 (extending deadline to file dispositive motions to March 16, 2022).

[51] Docket 25.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 9 of 61

## JURISDICTION

The Court has jurisdiction over Howell's 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331. The Court exercises its supplemental jurisdiction over Howell's state claims pursuant to 28 U.S.C. § 1367.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial."[52] However, "[w]hen the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'"[53] If the movant meets their burden, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial."[54] The non-moving party may not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[55] In deciding a motion for summary judgment, a court views

---

[52] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[53] *Id*. (quoting *Celotex Corp.*, 477 U.S. at 325).

[54] *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

[55] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) (citations omitted).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 10 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 10 of 61

the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[56]

## DISCUSSION

### I. Fourth Amendment Claim

#### a. Legal Principles

Defendants contend that Soto and Childers are entitled to qualified immunity as to the federal constitutional claim.[57] The doctrine of qualified immunity shields government actors from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[58] Government officials are not entitled to qualified immunity on summary judgment if (1) the facts taken in the light most favorable to the plaintiff show that the officials' conduct violated a constitutional right, and (2) that right was clearly established at the time of the alleged violation.[59] Qualified immunity applies unless both prongs of the inquiry are satisfied.[60]

A court may "exercise [its] sound discretion in deciding which of the two

---

[56] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

[57] Docket 25 at 11–19.

[58] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).

[59] *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1066 (9th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

[60] *See Pearson*, 555 U.S. at 232.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 11 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 11 of 61

prongs of the qualified immunity analysis should be addressed first."[61]  However, it "is often beneficial" to analyze the first and then the second prong because this process "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."[62]

Howell contends that Soto and Childers "violated Dan Demott's Fourth Amendment right to be free from unreasonable seizure by using excessive force through unreasonabl[e] escalation of force."[63]  Howell asserts that Soto and Childers were "indifferent to Dan Demott's disability" and "tormented a mentally ill person appearing to suffer from delusional Viet Nam flashbacks with threats and chaotic bombardment of rounds and chemical agents, which were objectively unreasonable, yet reasonably expected to cause severe unnecessary distress to a disabled person."[64]

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its

---

[61] *Id.* at 236.

[62] *Id.*

[63] Docket 36 at 11.

[64] Docket 36 at 13.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 12 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 12 of 61

'reasonableness' standard."[65]  "In Fourth Amendment excessive force cases, we examine whether police officers' actions are objectively reasonable given the totality of the circumstances."[66]

To determine the reasonableness of the force used, a court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[67]  Other circumstances to consider include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; [and] the threat reasonably perceived by the officer."[68]  Additional relevant factors may "include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."[69]

---

[65] *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted).

[66] *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (citations omitted).

[67] *Graham*, 490 U.S. at 396 (citing *Garner v. Garner*, 471 U.S. 1, 8–9 (1985)).

[68] *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

[69] *Glenn v. Wash. Cnty.*, 673 F. 3d 864, 872 (9th Cir. 2911); *see also Deorle v. Rutherford*, 272 F. 3d 1272, 1283 (9th Cir. 2001) ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 13 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 13 of 61

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[70] "Only information known to the officer at the time the conduct occurred is relevant."[71] And while the availability of alternative measures to take a suspect into custody may be a relevant consideration in some cases, officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."[72]

### b. Integral-Participant Doctrine

First, the Court considers whether Soto and Childers may be held liable for the alleged use of excessive force. This is because Soto did not personally deploy the alleged excessive force, or any force at all.[73] And Childers did not personally make announcements or deploy less lethal projectiles, although he did deploy tear gas.[74] The Ninth Circuit explained that "[u]nder our cases, an official whose

_____

serious crime against others, but with a mentally ill individual.").

[70] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

[71] *Nehad*, 929 F.3d at 1132 (citations omitted).

[72] *Hughes v. Kisela*, 841 F.3d 1081, 1087 (9th Cir. 2016), *superseded on other grounds*, *Kisela v. Hughes*, 138 S.Ct. 1148 (2018).

[73] Docket 25-7 at 3–4, ¶¶ 4, 7 ("Throughout the call, I was located at the command center, not at Demott's residence. The command center is actually located a few blocks away out of sight of the residence. I was never at the residence . . . . I did not personally make the announcements, fire projectiles or deploy chemical agents.").

[74] Docket 25-6 at 2, ¶¶ 5–8 ("I did not make any of the announcements . . . . I also did not personally deploy projectiles as knock-knocks . . . . I did personally introduce chemical agents in

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 14 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 14 of 61

'individual actions' do 'not themselves rise to the level of a constitutional violation' may be held liable under section 1983 only if the official is an 'integral participant' in the unlawful act."[75]   The minimum level of involvement for liability under the integral-participant doctrine occurs in two situations:

> those in which (1) the defendant knows about and acquiesces in the constitutionally defective conduct as part of a common plan with those whose conduct constitutes the violation or (2) the defendant 'set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury.'[76]

With respect to the first category, the Ninth Circuit has held that officers are integral participants if an "officer was aware of the decision to use the [force], did not object to it, and participated in the [] operation knowing the [force] was to be deployed."[77]   Simply being present at the scene is not enough; the officer must have participated in either the planning or the execution of the unlawful use of force.[78]   In this case, both Soto and Childers participated in the planning and execution of the use of force.   Soto "coordinate[d] and supervise[d] the SWAT

---

the first round of deployment into the garage and to the left of the main door.  But there were many other people who deployed chemical agents in other locations in the residence at various times."). Docket 25-1 at 4 (In the second round, Childers deployed tear gas through the window of the garage man door.).

[75] *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (quoting *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020)).

[76] *Id*. (alterations in original) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

[77] *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).

[78] *See Peck*, 51 F.4th at 889 (citing *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009)).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 15 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 15 of 61

team's tactics so they were done in accordance with APD policies and procedures" after "they were approved and directed by the SWAT commander."[79] And Childers deployed chemical agents and did not object to their use by others.[80] The Court concludes that both Soto and Childers can accordingly be held liable under the integral-participant doctrine.

### c. Analysis of the Relevant Factors

Having determined that both Soto and Childers could be liable for the alleged Fourth Amendment violation, the Court turns to the first prong of qualified immunity: to assess whether a reasonable jury could conclude that Soto and Childers violated Demott's constitutional right to be free from the use of excessive force by analyzing all of the relevant factors that the Supreme Court and Ninth Circuit have identified as appropriate. The Court first considers the severity of the crime that the officers were responding to.[81] In this case, APD was responding to Howell's report that she feared an imminent assault by her father—a form of domestic violence. The Ninth Circuit has recognized that "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence

---

[79] Docket 25-7 at 2–3, ¶¶ 3, 7.

[80] Docket 25-6 at 2, ¶ 7.

[81] *See Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 16 of 61

calls than on any other type of call."[82]  Additionally, Alaska law provides that "[a] peace officer, with or without a warrant, *shall* arrest a person if the officer has probable cause to believe the person has, either in or outside the presence of the officer, within the previous 12 hours . . . committed domestic violence . . . whether the crime is a felony or a misdemeanor."[83]  Because there was probable cause to believe that Demott had committed a misdemeanor crime of domestic violence, Childers and Soto were attempting to effectuate a mandatory arrest under Alaska law.

The Ninth Circuit has also observed, however, that "the legitimate escalation of an officer's 'concern[] about his or her safety' is less salient 'when the domestic dispute is seemingly over by the time the officers begin their investigation.'"[84] Here, Howell and her children had already left the house by the time that the SWAT team arrived and used the chemical agents, less lethal rounds, and knock-knocks.[85]  Accordingly, the severity of the crime had substantially abated when that force was applied.

The Court next considers the immediate threat to the safety of the police

---

[82] *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)).

[83] Alaska Stat. § 18.65.530(a)(1) (emphasis added).

[84] *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (alterations in original) (quoting *Mattos*, 661 F.3d at 450).

[85] Docket 25-1 at 15 (Howell and her children were outside the residence at approximately 7:15 p.m.); Docket 25-1 at 27 (first use of force at approximately 10:55 p.m.).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 17 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 17 of 61

officers and to others during the course of the incident.[86]  The Ninth Circuit has

repeatedly emphasized that this factor is the most important.[87]  When police

officers first arrived at the scene, they were concerned that Demott had a rifle, but

by 7:34 p.m., they were "confident" it was "a BB gun."[88]  One police officer reported

hearing Demott say he "would shoot us through [the] window," but the officer

confirmed that "no gun [was] seen."[89]  Police officers were also aware that Demott

had access to a sword.[90]

Early on in the incident, Charlie informed the police officers that that there

was a .22 rifle and a .22 handgun locked in a safe in the home, but he also said

that Demott likely would not be able to access these weapons because Demott

had lost the key and his home was "extremely messy."[91]  Indeed, at 7:34 p.m., the

Computer Aided Dispatch reported that "real rifles in [the] res[idence] should be in

[the] safe" and that "he does not have [the] key."[92]   And while the passage of time

---

[86] *See Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9); *Lombardo*, 141 S. Ct. at 2241 (quoting *Kingsley*, 576 U.S. at 397) (holding that courts should consider "the severity of the security problem at issue" and the "threat reasonably perceived by the officer").

[87] *See, e.g.*, *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (quoting *George*, 736 F.3d at 838) ("Of all of these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'").

[88] Docket 25-1 at 23.

[89] Docket 25-1 at 22.

[90] Docket 25-1 at 22, 24.

[91] Docket 25-1 at 7.

[92] Docket 25-1 at 23.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 18 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 18 of 61

may have increased the risk that Demott would locate the key to the safe, when Girardin left the residence at 11:30 p.m., he informed the officers that he had not seen any firearms in the residence that evening.[93]

Police officers were also aware that Demott had some history of violence. For example, Howell informed the police officers that Demott had attacked police officers one time four or five years prior, although she did not provide any details about that incident.[94] Howell also informed police officers that Demott had hit Howell one time in the past but indicated it was with "a toy sword gently."[95]

When the SWAT team deployed the less lethal rounds and the first round of tear gas, Girardin was still in the house with Demott, increasing the nature of the threat at that time because of the potential hostage situation.[96] At this point in time, this factor suggests that the use of force was reasonable. But after Girardin had exited the residence safely, the nature of the threat that Demott posed to others substantially decreased, as the SWAT team was no longer responding to a

---

[93] Docket 25-1 at 21; *cf. Alford,* 785 F. Supp. 2d at 877 ("The passage of time increased [the decedent's] opportunity to find the rifle ammunition, which was not in a safe, and to locate the other high-powered weapons and ammunition, and figure out a way to unlock the safe they were in.").

[94] Docket 25-1 at 22.

[95] Docket 36-5 at 23–24.

[96] *Compare Lock v. Jenkins*, 641 F.2d 488, 496 (7th Cir. 1981) (holding that the use of tear gas was not unjustified following the taking hostage of a prison warden and several others), *with Estate of Escobedo v. Bender*, 600 F.3d 770, 782–84 (7th Cir. 2010) (*Escobedo I*) (holding that the law was clearly established that the use of tear gas against an armed suicidal man barricaded in his apartment violated the Fourth Amendment because, among other reasons, the man was not holding hostages).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 19 of 61

potential hostage situation.[97]  And Girardin informed the SWAT team that Demott was experiencing Vietnam flashbacks, did not have weapons, and was retreating to the crawl space.[98]  Accordingly, the SWAT team was then made aware that Demott was an unarmed man experiencing a mental health crisis who was refusing to leave his house.  This factor, therefore, tips against the reasonableness of the use of force after Girardin's exit.

The Court next considers the fact that Demott was actively resisting arrest by refusing to leave his home despite orders to do so.[99]  Demott was a "barricaded individual" according to the 2014 International Association of Chiefs of Police (IACP) Model Policy, upon which Howell relies, which defines a barricaded individual as "[a]n individual who is the focus of a law enforcement intervention effort, has taken a position in a physical location that does not allow immediate law enforcement access, and is refusing law enforcement orders to exit."[100] Throughout the entire incident, Demott remained in his residence, a location that prevented immediate law enforcement access, and refused to follow numerous orders to exit.

---

[97] *See Escobedo I*, 600 F.3d at 780–81.

[98] Docket 25-1 at 21; Docket 36 at 9.

[99] *See Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9); *Lombardo*, 141 S. Ct. at 2241 (quoting *Kingsley*, 576 U.S. at 397) (holding that courts should consider "whether the plaintiff was actively resisting").

[100] Docket 25-10 at 22.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 20 of 61

Moreover, when Howell first called 911, she informed the dispatcher that her father had barricaded the front door with plywood, although she also said that she thought she could take it down.[101]  Howell was able to leave the residence, although it is unclear from the record whether she removed the barricade or exited from another door.[102]  Indeed, the Computer Aided Dispatch suggests that the police officers did not know whether the barricade remained in place.[103]  That being said, when Girardin exited the residence, he informed the SWAT team that Demott had the front entryway "barricaded well with anything and everything that he could use."[104]  This factor accordingly weighs in favor of the reasonableness of the deployment of force.

Another factor that the Court considers is how quickly the SWAT team resorted to using force after encountering the individual.  Indeed, in one case, the Ninth Circuit held this was the "most important" factor in the Circuit's decision that excessive force may have been used because, viewing the facts in the light most favorable to the plaintiff, a police officer "escalated to deadly force very quickly" and shot at decedent "less than a minute" after the officer first came upon the

---

[101] Docket 36-8 at 2.

[102] Docket 25-1 at 15.

[103] *See* Docket 25-1 at 25 (call log reports that Demott was "poss[ibly] barricading [him]self in"); Docket 25-1 at 28 (call log reports that Demott "prob[ably] barricade[d] w[ith] stuff").

[104] Docket 25-1 at 21.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 21 of 61

decedent.[105]  Particularly in the context of police officers' response to someone experiencing a mental health crisis, it is ordinarily best practice for responding officers to take advantage of the time that they have to slow down and de-escalate the situation.[106]

In this case, the SWAT team had time on its side because it had up to 12 hours to effectuate a mandatory arrest.[107]  This was not a case in which the police officers were "forced to make split-second judgments" in a circumstance that was "tense, uncertain, and rapidly evolving."[108]  Police officers arrived on the scene at approximately 6:45 p.m., and Howell safely left the residence at approximately 7:15 p.m.[109]  The SWAT team first deployed projectiles at approximately 11:00 p.m. and began deploying chemical agents at approximately 11:30 p.m.[110]  Although the officers waited several hours before using non-lethal force against Demott, they did not appear to have taken advantage of this time to pursue any strategies to address Demott's mental health crisis but simply continued to make

---

[105] *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016).

[106] *See, e.g.*, *Glenn*, 673 F.3d at 877 (expert's opining that the "fundamental rules for approaching" an individual experiencing a mental health crisis are: "1) Slow it down, 2) Do not increase the subject's level of anxiety or excitement, 3) Attempt to develop rapport, 4) Time is on the side of the police").

[107] Alaska Stat. § 18.65.530(a)(1).

[108] *Tekle v. United St*ates, 511 F.3d 839, 847 (9th Cir. 2006) (quotation omitted).

[109] Docket 25-1 at 22.

[110] Docket 25-1 at 27–28.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 22 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 22 of 61

announcements over the loudspeaker system that went unheeded. Hence, the Court finds this factor is neutral.

Next the Court assesses the "quantum of force used."[111] This is because "[t]he gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to 'the type and amount of force inflicted.'"[112]

Howell maintains that the police officers first used excessive force against Demott when he was "tormented" with "threats" in the form of the loudspeaker announcements.[113] But these were not "threats"; they were instead the warnings that officers should give, when feasible, before employing force.[114] In accordance with this requirement, Officer Gould informed Demott over the loudspeaker that police officers were present and that they had an arrest warrant for Demott and a search warrant for the residence. Officer Gould also warned Demott that if he did not cooperate, officers would use lethal or less lethal force against him, including "Taser, 40mm/ARWEN direct impact munitions, gas, and K9 uses of force." Officer

---

[111] *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

[112] *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle*, 272 F.3d at 1279).

[113] Docket 36 at 13.

[114] *See, e.g.*, *Deorle*, 272 F.3d at 1284 ("Appropriate warnings comport with actual police practice" and "such warnings should be given, when feasible, if the use of force may result in serious injury . . . ."); *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (quoting *Deorle*, 272 F.3d at 1284) ("[P]olice officers normally provide such warnings where feasible, even when the force is less than deadly" and "failure to give such warning is a factor to consider," especially if "there was 'ample time to give that order or warning and no reason whatsoever not to do so.'").

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 23 of 61

Gould made so many announcements that there "were too many to . . . assign any specific number of times they were made."[115]  There is no constitutional violation when the police officers issued warnings pursuant to standard police practice and in accordance with the requirements of the Fourth Amendment.[116]  Rather, these warnings weigh in favor of a determination that the force used was not constitutionally excessive.

Howell also points to the "chaotic bombardment of rounds" as excessive force.[117]  This is in reference to the "knock-knocks," which "involve[d] deployment of foam projectiles against [a] structure in order to gain the attention of a suspect."[118]  Here, the projectiles were of such force as to break windows of the residence.[119]  In addition, the officers used tear gas.  Chemical agents such as tear gas are identified as "intermediate force" because they are "capable of inflicting significant pain and causing serious injury" and "present a significant intrusion upon an individual's liberty interests," although they are "less severe than deadly force."[120]  Recent research shows that tear gas and pepper spray cause

---

[115] Docket 25-1 at 3.

[116] *See Glenn*, 673 F.3d at 872 (When analyzing "[t]he strength of the government's interest in the force used . . . [o]ther relevant factors include . . . whether proper warnings were given.").

[117] Docket 36 at 13.

[118] Docket 25-7 at 3, ¶ 6(b).

[119] Docket 25-1 at 3–4.

[120] *Young*, 655 F.3d at 1161 (analyzing the quantum of force deployed by pepper spray and baton blows)*; see also Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979) ("[U]se of potentially dangerous quantities [of tear gas] is appropriately reserved for . . . narrowly defined

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 24 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 24 of 61

"acute respiratory symptoms" and "can cause serious and long-lasting lung problems, skin burns, eye injuries and even death."[121] The use of chemical agents in addition to less lethal projectiles are considered significant force.[122] In cases such as this one, there was "sufficient notice of the need for caution when using . . . aggressive tactics to subdue a mentally unstable individual who is resisting arrest."[123]

The Ninth Circuit has held that it may be constitutionally unreasonable to use chemical agents and projectiles against individuals "who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others."[124] When all reasonable inferences are drawn in Howell's

---

[circumstances].").

[121] *Anti Police-Terror Project*, 477 F. Supp. 3d at 1083.

[122] *Id*. at 1086–87 (first citing *Young*, 655 F.3d at 1161; then citing *Deorle*, 272 F.3d at 1285) ("[C]hemical agents [and] less lethal projectiles . . . constitute significant force.").

[123] *Alford v. Humboldt Cnty.*, 785 F. Supp. 2d 867, 882 (N.D. Cal. 2011) (concluding that there was a genuine issue of material fact on reasonableness when an officer deployed a pyrotechnic device into a home where a man experiencing a mental health crisis had barricaded himself).

[124] *Nelson v. City of Davis*, 685 F.3d 867, 885 (9th Cir. 2012)*; see also Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1214–15 (holding that the plaintiffs established a likelihood of success on their Fourth Amendment claim for purposes of a preliminary injunction where police used tear gas, pepper spray, and flash bang grenades against peaceful protesters); *Young*, 655 F.3d at 1165 (taking the facts in the light most favorable to the plaintiff, the use of pepper spray and a baton against an individual who disobeyed a police officer's order to enter vehicle could constitute a violation of the Fourth Amendment); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (viewing the facts in the light most favorable to the plaintiffs, the use of pepper spray against nonviolent protestors who disobeyed an order, but otherwise posed no threat "was plainly in excess of the force necessary under the circumstances, and no reasonable officer could have concluded otherwise"), *vacated on other grounds*, 534 U.S. 801 (2001); *Madriz v. King Cnty. Police Dep't*, No. 5:13-cv-05096-EJD, 2015 WL 8527517, at *1, *5–6 (N.D. Cal. Dec. 11, 2015) (denying summary judgment because the deployment of "chemical agents and projectile force" while executing a "high risk Narcotic search warrant" against

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 25 of 61

favor, a reasonable jury could conclude that this factor warrants a finding that this use of force was unreasonable.

Another factor that the Court considers is "whether there were less intrusive means of force that might have been used before officers resorted to" additional chemical agents and less lethal rounds.[125] A police officer is not required to use "the least intrusive means of responding to an exigent situation"; instead, the officer "need only act within that range of conduct we identify as reasonable."[126] And yet in determining whether the use of force was reasonable, a court may consider the availability of less intrusive alternatives to the force employed.[127] This is because police officers are "required to consider 'what other tactics if any were available' to effectuate their arrest."[128] "[I]f there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate[s] against finding [the] use of force reasonable.'"[129]

In this case, a reasonable jury could find that the SWAT team could have

---

individuals sleeping in a house could constitute excessive force).

[125] *Glenn*, 673 F.3d at 876; *Lombardo*, 141 S. Ct. at 2241 (quoting *Kingsley*, 576 U.S. at 397) (holding that courts should consider "any effort made by the officer to temper or to limit the amount of force").

[126] *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

[127] *See Glenn*, 673 F.3d at 876.

[128] *Headwaters Forest Def.*, 240 F.3d at 1204 (alterations omitted) (quoting *Chew v. Gates*, 27 F.3d 1432, 1367 (9th Cir. 1994)).

[129] *Glenn*, 673 F.3d at 876 (quoting *Bryan*, 630 F.3d at 828, 831).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 26 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 26 of 61

used less intrusive alternatives. For example, because they were aware that Demott did not have access to a phone or Wi-Fi in his house, a reasonable jury could find that the SWAT team could have used a throw phone to try to contact him, particularly after their repeated announcements over the loudspeaker had gone unheeded.[130] Additionally, a reasonable jury could conclude that the SWAT team could have consulted with mental health professionals, such as the psychiatrists who had previously treated Demott at API or CIT-certified officers.[131] Howell's expert, Dennis Waller, identified numerous other alternatives that he concludes could have been used.[132] The Court does not suggest that the SWAT team was required to attempt any of these less intrusive alternatives to the chemical agents and less lethal rounds, but the availability of lesser alternatives that were not employed suggests that a reasonable jury could find that the deployment of force in this case did not fall within the constitutionally required range of conduct.

The Court also considers the number of lives at risk when the SWAT team

---

[130] *Alford*, 785 F. Supp. 2d at 878 ("A jury could find unreasonable [the officer's] failure to . . . deliver a throw phone or other communication device into the . . . residence before ordering the use of force . . . [by deploying] a substantial number of tear gas canisters.")*; see also* Docket 36-2 at 42 ("I've known numerous incidents where people didn't have . . . a means of communicating, so they put in a bag phone or something . . . . [I]t would appear to me that the APD SWAT team was very well-equipped, and so they had robots.").

[131] *See* Docket 36-2 at 5 ("I mean, they were aware that he had recently been released from API, a psychiatric institution. You have resources there. What is the best way to deal with this?"); Docket 36-2 at 37 ("[B]ecause there's no documentation that [a CIT trained officer] . . . was ever consulted, and I would expect that they would or should have been.").

[132] *See e.g.*, Docket 36-2 at 14–18.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 27 of 61

deployed force.[133]  This is because the Supreme Court has recognized that "[w]e think it appropriate in this process [of determining reasonableness] to take into account . . . the number of lives at risk . . . ."[134]  If a decedent "intentionally placed himself [or herself] and the public in danger by unlawfully engaging in [reckless conduct,]" this factor would suggest that police officers used reasonable force to address that threat.[135]  In this case, when the SWAT team deployed less lethal rounds and tear gas while Girardin remained in the residence, the SWAT team could reasonably have been of the view that Girardin's life was at risk.  But once Girardin exited the house unharmed by Demott, there did not appear to be any innocent members of the public who were then at risk of harm.

Additionally, the Court considers that it should have been apparent to the SWAT team that Demott was experiencing a mental health crisis when they used force against him.[136]  "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law

---

[133] *See Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 384 (2007)); *Williamson v. City of National City*, 23 F.4th 1146, 1153 (9th Cir. 2022) (citing *Scott*, 550 U.S. at 384) ("Where an arrestee's conduct risks the lives or safety of innocent bystanders, the court also considers her [or his] relative culpability . . . .").

[134] *Scott*, 550 U.S. at 384.

[135] *Id.*

[136] *Deorle*, 272 F.3d at 1283 ("[W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, this is a factor that must be considered in determining . . . the reasonableness of the force employed.").

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 28 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 28 of 61

enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense."[137]  When possible, "the use of officers and others trained in the art of counseling is ordinarily advisable."[138]  "This is because when dealing with a disturbed individual, 'increasing the use of force may . . . exacerbate the situation,' unlike when dealing with a criminal, where increased force is more likely to 'bring[] a dangerous situation to a swift end.'"[139]  And "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."[140]  This is not to say, however, that there is "a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals."[141]  Instead, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed."[142]

In this case, the SWAT team knew that Demott was acting "crazy" and had

---

[137] *Id*. at 1282–83.

[138] *Id*. at 1283.

[139] *Glenn*, 673 F.3d at 877 (alterations in original) (quoting *Deorle*, 272 F.3d at 1283).

[140] *Deorle*, 272 F.3d at 1283.

[141] *Id*.

[142] *Id*.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 29 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 29 of 61

been diagnosed with bipolar disorder and manic depression but was refusing to take his medication. The SWAT team also was later informed by Girardin that Demott was experiencing Vietnam flashbacks. Moreover, Demott had not physically harmed anyone.[143] Despite these facts, which show that Demott's mental health condition diminished the government's interest in using force against him, Howell contends that the SWAT team did not take any action to address Demott's mental health in violation of the APD Crisis Intervention Training (CIT) policy.[144]

APD's CIT policy provides that it is for "internal use only and does not enlarge an employee's civil liability in any way."[145] It explains further that "[a] violation of this policy, if proven, can only form the basis of a complaint by this department for non-judicial administrative action."[146] Nonetheless, the Ninth Circuit has held that "[a]lthough [police department use of force] training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable."[147]

---

[143] Docket 25-1 at 15–16; Docket 36-8 at 2–3; Docket 36-12 at 8.

[144] Docket 36 at 3–4; *see* Docket 36-3 (APD's CIT Policy).

[145] Docket 36-3 at 1.

[146] Docket 36-3 at 1.

[147] *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003), *cert. denied*, 542 U.S. 918 (2004).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 30 of 61

The evidence in the record suggests that responding police officers and the SWAT team did not take any action to address Demott's mental health crisis. Although 11 APD officers at the scene had participated in a 40-hour critical intervention training, and members of the Crisis Negotiation Team were at the scene as well, there is no evidence that the officers consulted their expertise to create or implement a mental health intervention.[148] Defendants' expert stated that these officers' training "[could not] be utilized until a 2-way dialogue ha[d] been established between officers and the suspect" and they did not get to use their crisis intervention training because "Demott refused to engage in dialogue and he exhibited no willingness to converse with officers."[149] Childers also explained that the SWAT team's response on the night in question was "almost textbook of a SWAT callout," implying that the SWAT team made no accommodations for Demott's mental health.[150] Indeed, both Childers and Soto erroneously believed that the CIT policy did not apply when an individual in crisis is suspected of committing a crime.[151]

Several District Courts have found that it is unreasonable for police officers

---

[148] Docket 25-10 at 22–23. However, it appears that members of the Crisis Negotiation Team interviewed Howell, Charlie, and Girardin and forwarded what they learned to the command post. *Id*.

[149] Docket 25-10 at 23.

[150] Docket 36-6 at 30.

[151] Docket 36 at 4; Docket 25-6 at 2–3, ¶ 8; Docket 25-7 at, ¶ 9. The CIT policy does not state that it does not apply where an individual in crisis has committed a crime. *See* Docket 36-3.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 31 of 61

to use force against an individual experiencing a mental health crisis without first attempting to address that individual's mental health. For example, in *Conatser v. City of North Las Vegas*, police were informed that the decedent, named Phillip, "was violent, suicidal, and had a history of mental illness."[152] The police were also told he had a knife and a Taser.[153] Shortly after police officers arrived on the scene, Phillip exited the residence and said something along the lines of "go ahead, shoot me, shoot me."[154] When Phillip turned to walk back into the residence, a police officer fired a beanbag round and a Taser at him.[155] Phillip fell to the ground. As he was getting up, the police officer saw that he had a knife. Although the facts were largely in dispute, the parties seemed to agree that police officers then deployed another round of less lethal beanbags against Phillip and also sprayed an entire can of mace in his face, even though Phillip had not then brandished a weapon or threatened the officers. The parties disputed whether several seconds later, Phillip moved toward the officers with a knife or approached them calmly. He was then fatally shot.[156]

The Court found that viewing the evidence in the light most favorable to

---

[152] No. 2:06-CV-01236-PMP-LRL, 2009 WL 10679150, at *1 (D. Nev. Nov. 9, 2009).

[153] *Conatser*, 2009 WL 10679150, at *1.

[154] *Id*. at *2. The commanding officer at the scene recalled Phillip using profanity in these remarks, but the case was before the Court on summary judgment, where Plaintiff's plausibly alleged facts are assumed to be true. *Id*.

[155] *Id*.

[156] *Id*. at *3–4.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 32 of 61

Case 3:20-cv-00301-SLG    Document 46    Filed 12/16/22    Page 32 of 61

Phillip, a reasonable jury could find that the police officers violated his Fourth Amendment rights, explaining that:

> [A] reasonable jury could find the degree of force used by officers in the events leading up to Phillip allegedly charging the officers objectively was unreasonable given that Phillip was mentally ill and attempting to reenter the residence when officers used less lethal beanbag rounds and the taser on him, thereby exacerbating the situation with a mentally ill individual.[157]

*Conatser* has similarities to this case. Although there were CIT-trained police officers at Demott's residence, their expertise was not called upon to implement a mental health intervention, just as CIT-trained officers were not called to help Phillip. Instead of attempting a mental health intervention, in each case, officers exacerbated the situation with a mentally ill individual by applying less lethal force. *Conatser* suggests that a reasonable jury could find that it was unreasonable for Childers and Soto to apply less lethal force without first attempting a mental health intervention, particularly after Girardin had left the residence and a reasonable jury could find that Demott did not pose an immediate threat to anyone.

Similarly, in *Funke v. Hatten*, the District Court granted summary judgment to the plaintiff, finding on undisputed facts that the officer's conduct was objectively unreasonable because the officer "chose to deploy 'deadly force' against an

---

[157] *Id*. at *7.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 33 of 61

'emotionally disturbed' man despite having the time and opportunity to engage in some type of mental health intervention," such as requesting the assistance of a crisis intervention team member or an officer trained in mental health interventions.[158]

However, the Ninth Circuit reversed another District Court's finding that a reasonable jury could conclude that police officers' use of lethal force was unreasonable where the officers "ignor[ed] the CIT protocol" and made a "hasty decision to shoot . . . before the other CIT officers had more than a minute to speak [to the deceased.]"[159]  The Ninth Circuit explained that a videotape of the incident showed "that at the time [the officer] fired the shot, [the decedent] appeared to be holding a knife to [his mother's] throat" and it was "reasonable for an officer to use deadly force to stop someone who the officer reasonably believes poses a threat of serious physical harm to others."[160]

These three cases taken together show that a reasonable jury could find that a police officer's failure to take a person's mental health crisis into account before using intermediate force against that person could be unreasonable unless the

---

[158] No. 2:19-cv-01335-RFB-EBJ, 2021 WL 2346003, at *5–6 (D. Nev. June 8, 2021) (quoting *Glenn*, 673 F.3d at 872).

[159] *Oquendo v. Las Vegas Metro. Police Dep't*, No. 2:11-cv-00698-MMD-PAL, 2013 WL 1314886, at *6 (D. Nev. March 28, 2013).

[160] *Oquendo v. Las Vegas Metro. Police Dep't*, 611 Fed.Appx. 474, 474 (9th Cir. 2015) (citing *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1119 (9th Cir. 2005)).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 34 of 61

individual experiencing the mental health crisis poses an immediate threat of serious physical harm to others. In this case, as discussed above, Demott posed a threat to Girardin's safety while Girardin remained in the house. But after Girardin had left the house unharmed, Demott was a lone individual experiencing a mental health crisis in his home. This factor accordingly suggests that after Girardin had left the house, a reasonable jury could find that Childers and Soto were constitutionally required to have considered a mental health intervention or other less invasive alternatives before deploying additional less lethal force against Demott.

### d. Objective Reasonableness

Having considered all of the factors that are relevant to this case, the Court concludes its analysis of whether the force used against Demott was objectively reasonable by balancing "the gravity of the intrusion on the individual against the government's need for that intrusion."[161] It is instructive to consider how other courts have balanced these factors in similar cases.

Defendants rely on *Bayer v. City of Simi Valley* to contend that the use of force in this case was reasonable.[162] But *Bayer* is an unpublished decision from the Ninth Circuit; as such, it is not precedent. Moreover, *Bayer* was issued before

---

[161] *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).

[162] 43 Fed. Appx. 36 (9th Cir. 2002); *see* Docket 25 at 14–19.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 35 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 35 of 61

January 1, 2007, so it should not even have been cited to this Court.[163]  That being said, Howell did not cite to any cases with facts similar to the case at hand.[164]  Accordingly, the Court has independently identified the following cases that shed light on the objective reasonableness analysis in this case:

In *Estate of Smith v. Marasco*, the Third Circuit reversed in part the District Court's grant of summary judgment to police officers.[165]  There, the police were responding to a minor complaint and knew the decedent, Smith, had Post-Traumatic Stress Disorder and was mentally unstable.  The police officers tried and failed to contact Smith, so they went to the backyard of the house to search for him.  One of the responding officers saw a red light from inside the house and believed it might be a laser firearm that Smith was directing at a police officer.  Thereafter, the officers engaged the special emergency response team to deploy tear gas and flash bang grenades into the decedent's house.[166]  The Third Circuit held that the police officers had probable cause to seek an arrest warrant because the officers had an objectively reasonable belief that Smith had targeted them with a laser-sighted firearm.[167]  Even so, the Circuit held that there was sufficient

---

[163] 9th Cir. R. 36–3(a), (c).  *Bayer* does not appear to fall within one of the enumerated exceptions that would allow a party to cite to it.  *Id*.

[164] *See* Docket 36 at 12–13.

[165] 318 F.3d 497, 501 (3d Cir. 2003).

[166] *Id*. at 501–04.

[167] *Id*. at 513–15.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 36 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 36 of 61

evidence that the use of force was unreasonable to warrant the case going to a jury and remanded the case to the District Court to decide whether the officers had qualified immunity.[168]  In its decision, the Third Circuit quoted a decision from the Tenth Circuit:

> The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens.  Indeed, it is the SWAT team's extraordinary and overwhelming show of force that makes 'dynamic entry' a viable law enforcement tactic in dealing with difficult and dangerous situations.[169]

The Third Circuit explained that the District Court had erred in granting summary judgment to the police officers by "failing to take into account . . . the severity of the threat to which officers were responding."[170]  Specifically, "[t]here was no indication that [the decedent] had been using a gun recently or that [the decedent] ever ha[d] used a gun in a violent manner," and "there [wa]s no indication in the record that [the decedent] had any history of violence of which the officers may have been aware."[171]  Like the decedent in *Smith*, there was no evidence in this case that Demott had used a gun recently, and Demott did not have a history of using a gun in a violent manner.  Although Howell informed the

---

[168] *Id*. at 515–18.

[169] *Id*. at 517–18 (quoting *Holland v. Harrington*, 268 F.3d 1179, 1190–95 (10th Cir. 2001)).

[170] *Id*. at 516.

[171] *See Id*. at 516–17.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 37 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 37 of 61

police in the 911 call that her father had attacked police approximately four or five years ago, there was no indication that Demott had used a gun during that incident.[172] Moreover, unlike Smith, Demott did not appear to have pointed a gun at the responding police officers, suggesting that Demott posed considerably less of a threat to the officers. The Third Circuit's decision accordingly indicates that a reasonable jury could conclude that the use of force against Demott was unreasonable.

In *Alford v. Humboldt County*, police officers performed a welfare check because a man named Peter Stewart had entered a family friend's home unannounced "in an agitated state, wearing a wetsuit top and long coat on a warm summer day" and "speaking delusionally" by communicating with people who did not exist and talking about harming others.[173] Thereafter, all of the residents of the house left the home safely.[174] When the officers arrived, Stewart pulled out two butter knives and screamed "Welcome to the Dragon, motherf * * * ers" before running into the house. Stewart then repeatedly "dry-fired" a .22 rifle at the officers. The owner of the home was outside with the police and informed them that he had several other guns locked in a safe, but the ammunition for the .22 rifle was not in the safe. No negotiations took place between the officers and Stewart. Many

---

[172] Docket 25-2 at 1:18–1:38; Docket 36-8 at 2.

[173] 785 F. Supp. 2d at 870.

[174] *Id*. at 870–71.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 38 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 38 of 61

hours after arriving on the scene, the officers started deploying CS gas into the home.[175]  When Stewart failed to exit the home in response to the tear gas, the police began deploying grenades that "produced more tear gas and smoke."[176]  There was evidence that the officer who deployed the grenades may have known it was a pyrotechnic device, deployed in contravention of existing orders and policy.  About ten minutes after the final grenade was deployed, a fire ignited in the house, which eventually killed Stewart.[177]

The District Court first addressed whether a reasonable jury could find that the defendant police officer who served as the incident commander violated the Constitution by failing to deliver a throw phone or other means of communication before launching tear gas into the residence.  The District Court observed that the officers had approached to within two to three feet of the residence to launch the chemical grenades into the windows and determined that "[a] jury could find unreasonable [the commander's] failure to take similar steps to deliver a throw phone or other communication device into the . . . residence before ordering the use of force."[178]

---

[175] Id. at 871–72.

[176] Id. at 873.

[177] Id.

[178] Id. at 878.  But on this topic the court granted qualified immunity to the commander defendant because it found that "no pre-existing authority established that it was unreasonable for law enforcement officers to fail to deploy a throw phone as part of their efforts to negotiate a peaceful end to a standoff."  Id. at 882.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 39 of 61

The District Court then addressed the use of the pyrotechnic grenades. On this issue, the District Court held that there was sufficient evidence for a reasonable jury to find that the defendant who had deployed the pyrotechnic grenades into the house had violated the Constitution.[179]

The instant case is similar to *Alford*. In both cases, the responding officers were aware that a person was undergoing a mental health crisis. And in the hours leading up to the alleged use of excessive force, both Stewart and Demott acted erratically and threatened violence against others. In this case, Demott was ripping down curtains and went towards Howell in a manner that caused Howell to fear that Demott would hurt her.[180] Stewart arguably presented more of a threat before barricading himself in his family friend's house because Stewart had dry-fired a .22 rifle at the officers several times. Nonetheless, the court in *Alford* determined that when the officer decided to deploy a pyrotechnic device against an unstable individual who was resisting arrest, a reasonable jury could find a constitutional violation because Stewart no longer posed an immediate threat to anyone's safety.[181]

The key difference between the two cases is that in this case, when the SWAT team deployed the knock-knocks and the first round of tear gas, Girardin

---

[179] *Id*. at 882.

[180] Docket 25-1 at 15–16.

[181] 785 F. Supp. 2d at 882.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 40 of 61

was still in the house.[182]  As with the ammunition in *Alford*, each passing hour increased the likelihood that Demott would gain access to the safe with guns inside;[183] but in this case, if Demott had accessed the guns, he could have then posed an immediate threat to Girardin's safety.  The SWAT team had not had any communication with Demott or Girardin over the course of many hours, so they may have believed they were addressing a potential hostage situation.  And yet Demott was seen alone and unarmed at a window at approximately 11:00 p.m.— shortly before the first round of tear gas was deployed.[184]

When Girardin left the house at approximately 11:45 p.m., the need to use intermediate force against Demott substantially decreased.[185]  Girardin had not been harmed by Demott.  And Girardin had informed the SWAT team that Demott did not have any weapons other than a BB gun.[186]  Girardin had also told the SWAT team that Demott was having a "Vietnam flashback" and encouraging Girardin to get in the crawl space, which Demott referred to as a "bunker," but Girardin declined to do so because it was too cold in the crawl space.[187]  The Ninth Circuit has repeatedly warned that police officers should be wary of the use of force

---

[182] Docket 25-1 at 27–28.

[183] 785 F. Supp. 2d at 877.

[184] Docket 25-1 at 27.

[185] Docket 25-1 at 28.

[186] Docket 25-1 at 21.

[187] Docket 4 at 8, ¶ 34.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 41 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 41 of 61

against someone who is experiencing a mental health crisis and who does not pose an immediate threat to others.[188]

Viewing the facts in the light most favorable to Howell, a reasonable jury could find that Demott did not pose any immediate threat to others after Girardin left the residence. But instead of attempting to address Demott's mental health at that time,[189] the SWAT team continued to deploy tear gas into the residence, including into the crawl space.[190] This is a significant use of force; courts have recognized that "while it has been claimed that tear gas . . . produce[s] only temporary irritation and discomfort, recent studies document that [tear gas] can cause serious and long-lasting lung problems, skin burns, eye injuries and even death."[191] And Howell's expert testified that the specific danger posed by the tear gas was to escalate the situation. He explained: "why would you [deploy gas] to aggravate the situation more, I mean, to the point where this guy actually puts himself in a position where he can't survive, he dies."[192]

The Court concludes that there is sufficient evidence such that a reasonable jury could find that, particularly after Girardin had safely left the residence, the

---

[188] *See e.g.*, *Deorle*, 272 F.3d at 1283; *Glenn*, 673 F.3d at 877.

[189] For example, the SWAT team could have tried to use a throw phone to put Demott in contact with the Crisis Negotiation Team. *See, e.g., Alford*, 785 F. Supp. 2d at 878.

[190] Docket 25-1 at 30.

[191] *Anti Police-Terror Project*, 477 F. Supp. 3d at 1083 (citations and alterations omitted).

[192] Docket 36-2 at 54–55.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 42 of 61

officers' continued use of tear gas against Demott violated his Fourth Amendment rights.

### d. Clearly Established Law

The Court now turns to the question of whether the law was clearly established at the time of the alleged constitutional violation such that a reasonable officer then would have known that the use of tear gas against Demott, particularly after Girardin had left the residence, could constitute a violation of Demott's constitutional right to be free from the use of excessive force. The Supreme Court has held that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[193] While there need not be "a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate."[194]

Howell maintains that the law is clearly established by referencing the 1980s Memphis Model, the 2014 IACP Model Policy for Persons Affected by Mental Illness or in Crisis Model, and the Police Executive Research Forum, all of which together, according to Howell, create national standards for police conduct.[195] However, to determine whether the law is clearly established for purposes of qualified immunity, a court looks to judicial decisions issued prior to the date of the

---

[193] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[194] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Creighton*, 483 U.S. at 640).

[195] Docket 36 at 13–15.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 43 of 61

alleged violation.[196]  A court in this circuit looks first to binding precedent issued by the Supreme Court and the Ninth Circuit.[197]  "'In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established' for qualified immunity purposes, 'including decisions of state courts, other circuits, and district courts.'"[198]  Notably, the Ninth Circuit has not identified models for police conduct as a source of authority on clearly established law.   The Court therefore looks only to judicial decisions issued prior to November 5, 2018, the date of this incident.

A review of the decisional law at that time indicates that it was clearly established then that "where no immediate threat to the safety of others exists, law enforcement officers are required to consider less intrusive tactics" before using "aggressive tactics to subdue a mentally unstable individual who is resisting arrest."[199]

In *Estate of Escobedo*, for example, the Seventh Circuit held that taking the facts in the light most favorable to the estate, officers were on notice that their use of an excessive amount of tear gas and flash bang grenades against an individual

---

[196] *See Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022).

[197] *Boyd*, 374 F.3d at 781 (citations omitted) ("In the Ninth Circuit, we begin our inquiry by looking to binding precedent . . . . If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end.").

[198] *Drummond*, 343 F.3d at 1060 (alterations omitted) (quoting *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995)).

[199] *Alford*, 785 F. Supp. 2d at 882.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 44 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 44 of 61

experiencing a mental health crisis could be unconstitutional.[200]   To reach this conclusion, the Seventh Circuit relied on cases from several circuits holding that "the use of [tear gas against prisoners] should be strictly limited to circumstances presenting the utmost degree of danger and loss of control" and emphasized that the use of tear gas against a prisoner is not appropriate when that person does "not constitute *an actual threat*."[201]   Applying that reasoning to non-prisoners, the Seventh Circuit explained that "[b]ased on controlling precedent from this Circuit and the clear trend in the law from our sister circuits, the clearly established law as of July 19, 2005, established that the use of tear gas is unreasonable" when numerous factors are present, several of which are relevant to this case, including (1) "attempting to subdue individuals as opposed to mass crowds"; (2) "when the individual does not pose an actual threat"; (3) "when the individual is not holding hostages" and (4) "when the individual is incapacitated in some form."[202]

The Seventh Circuit further relied on *Estate of Smith,* discussed *supra*,[203] to show that the law was clearly established in 2010 that the use of tear gas by law enforcement officers is subject to constitutional limits.[204]   The Court explained that

---

[200] 600 F.3d at 783–86.

[201] *See Id*. at 781–82 (emphasis in original); *but see Estate of Escobedo v. Bender*, 702 F.3d 388, 404–05 (7th Cir. 2012) (*Escobedo II*) (upholding the grant of qualified immunity as to officers after a jury trial where the jury found as a matter of fact that the decedent posed a threat to officers).

[202] *Id*. at 783.

[203] *See* discussion *supra* pp. 36–38.

[204] 600 F.3d at 782 (citing *Estate of Smith*, 318 F.3d 497 (3d Cir. 2003)).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 45 of 61

"[t]he similarity of the facts [i]n the [*Smith*] case and of Escobedo's situation placed the Officers on notice that their entry was possibly unconstitutional."[205]  The same is true in this case.  The similarity of the facts in *Smith* and *Escobedo* is such that the police officers at Demott's residence were on notice that their use of tear gas against Demott, particularly after Girardin had left the house, could be unconstitutional.

However, "when there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity."[206]  Here, a jury must determine whether Demott posed an actual and immediate threat to the officers, particularly after Girardin had left the residence.[207]

### e.  The Failure to Train Claim

Howell contends that the Municipality is subject to liability for the officers' excessive force based on a failure to train its officers.[208]  A local governing body is not liable under § 1983 "unless action pursuant to official municipal policy of some

---

[205] *Id*. at 783 (citations omitted).

[206] *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (alteration omitted) (quoting Ninth Circuit Model Civil Jury Instruction 9.34 (2017)).

[207] *See, e.g., Escobedo II*, 702 F.3d at 404–05 (upholding the grant of qualified immunity as to officers after a jury trial where the jury found as a matter of fact that the decedent posed a threat to officers).

[208] Docket 36 at 15–17.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 46 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 46 of 61

nature caused a constitutional tort."[209]  The municipal policy or practice must be "the moving force of the constitutional violation."[210]

To allege a claim on the basis of failure to train, Howell must show that (1) Demott was "deprived of a constitutional right"; (2) the Municipality's training policy "'amounts to deliberate indifference to the constitutional rights of the persons[]' [experiencing a mental health crisis] with whom its police officers are likely to come into contact"; and (3) the "constitutional injury would have been avoided had the [Municipality] properly trained those officers."[211]  The Supreme Court has explained that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[212]  This is because "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the untrained employees came into contact.'"[213]  Moreover, the policymakers must be "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights."[214]

[209] *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).

[210] *Id.* at 694.

[211] *Blakenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (alterations omitted) (quoting *Lee v. City of Los Angles*, 250 F.3d 668, 681 (9th Cir. 2001)).

[212] *Connick v. Thompson*, 563 U.S. 51, 61 (9th Cir. 2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)).

[213] *Id.* (alteration omitted) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[214] *Id.* (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 47 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 47 of 61

Howell contends that the "Municipality's 2009 Crisis Intervention Team (CIT) policy still in effect in 2018 reflects deliberate indifference to the rights of mentally ill people in crisis when compared to the 2014 [IACP] Model Policy for Responding to Persons Affected by Mental Illness or in Crisis which is the national standard of care."[215]  However, Howell does not explain how these two policies are different and why this difference renders APD's policy constitutionally inadequate.  As several District Courts have recognized, the fact that the IACP Model Policy "may be an appropriate or even ideal model for dealing with mentally unstable individuals does not mandate that all other training, policies, and procedures are inadequate."[216]

Howell also alleges that the Municipality's failure to train is evidenced by the fact that several of its employees failed to follow the CIT policy in response to Howell's 911 call.[217]  For example, the 911 call taker and dispatcher did not send someone who was CIT certified to perform the initial response to the scene.[218]

---

[215] Docket 36 at 16 (internal citations omitted).

[216] *Spears v. Gautreaux*, No. 17-105-JWD-EWD, 2020 WL 3271993, at *24 (M.D. La. June 17, 2020) (granting summary judgment to sheriff defendant on a § 1983 failure to train claim that alleged that the sheriff's training policies failed to comply with the Memphis Model); *see also Estate of Jaquez ex rel. Public Adm'r of Bronx Cnty. v. City of New York*, No. 10 Civ. 2881(KBF), 2014 WL 2696567, at *6 n.6 (S.D.N.Y. June 9, 2014) ("The Court also notes that plaintiffs do not point to any cases in which failure to adopt a particular type of training has been found actionable . . . the question is not whether more effective models exist, but whether the City's current training was so insufficient—and the City was on notice that it was so insufficient—that the City's failure to use a different training model amounted to a constitutional violation.").

[217] Docket 36 at 16.

[218] Note that the 911 call taker and dispatcher were not named in the Complaint.  *See* Docket 4.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 48 of 61

Additionally, Howell alleges inadequate training is demonstrated by Childers and Soto's failure to employ de-escalation techniques, as each officer erroneously believed that the CIT Policy was not applicable because Demott was subject to arrest.[219]

The Supreme Court has explained, however, that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[220] As Defendants point out, Howell has not demonstrated that there is a pattern of constitutional violations because Howell has not identified any other occasion when police officers at APD have violated the CIT policy in a manner that would have put the Municipality on notice that its training was inadequate.[221] And "absent evidence of a 'program-wide inadequacy in training,' any shortfall in a single officer's [or two officers'] training 'can only be classified as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference.'"[222] Although the Ninth Circuit has identified a few exceptional situations in which an isolated constitutional violation would be sufficient, Howell

---

[219] Docket 36 at 16.

[220] *Connick*, 563 U.S. at 62 (quoting *Bd. of Comm'rs of Bryan Cnty.*, 520 U.S. at 410).

[221] Docket 25 at 20.

[222] *Blakenhorn*, 485 F.3d at 485 (quoting *Alexander v. City of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 49 of 61

has not alleged any facts to show that these exceptions are relevant in this case.[223]

For the foregoing reasons, the Municipality is entitled to summary judgment on the § 1983 failure to train claim. Additionally, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."[224] Therefore, the Court grants summary judgment to the Municipality on this basis as well.

## II.        Alaska Constitutional Claim

Howell's complaint alleges that Soto and Childers are liable for violating the right of Demott to be free from unreasonable seizure guaranteed by Article I, Section 14 of the Alaska Constitution.[225] Defendants contend that they are entitled to qualified immunity as to this state constitutional claim because they are so entitled under federal law and "Alaska usually follows federal case law with respect to qualified immunity."[226]

However, Howell's complaint alleges a state constitutional claim for damages.[227] The Alaska Supreme Court has held that it "will not imply a private

---

[223] *Christie v. Iopa*, 176 F.3d 1231, 1235, 1238, 1240 (9th Cir. 1999) (identifying three situations in which isolated violations may be sufficient to establish a municipal "policy:" (1) the person causing the violation has final policymaking authority; (2) the final policymaker ratified a subordinate's actions; (3) a municipal actor disregarded a known or obvious consequence of his or her action demonstrating deliberate indifference).

[224] *Monell*, 436 U.S. at 691; *see also Connick*, 563 U.S. at 60 (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

[225] Docket 4 at 12, ¶ 68.

[226] Docket 25 at 13.

[227] Howell makes one request for injunctive relief, but this request is related to the *Monell* claim under § 1983. Docket 4 at 14–15, ¶ 82 ("The plaintiff requests injunctive relief compelling the

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 50 of 61

cause of action for damages under the Alaska Constitution 'except in cases of flagrant constitutional violations where little or no alternative remedies are available.'"[228]   Howell has not alleged that the facts of this case constitute a flagrant constitutional violation.    Moreover, there are alternative remedies available, including Howell's claim for damages under § 1983 and Howell's negligence claim.  The Court accordingly grants summary judgment to Defendants on Howell's state constitutional claim.

### III.   Negligence

Howell's complaint alleges that Soto and Childers are liable for negligence and that the Municipality is liable for the negligence of its employees under theories of vicarious liability and respondeat superior.[229]   The Court focuses on Soto and Childers' alleged negligence, although Howell's opposition to the motion for summary judgment appears to focus exclusively on the Municipality's negligence.[230]   "To make out a prima facie case of negligence," Howell must "present evidence on each of the following elements: duty, breach of that duty,

---

defendants to implement improved training and/or policies and/or procedures regarding crisis situations with people suffering from mental illness, including but not limited to enlisting friends, family, and/or medical providers and alternatives to unreasonable escalation of force.").

[228] *Larson v. State, Dep't of Corr.*, 284 P. 3d 1, 10 (Alaska 2012) (quoting *Hertz v. Beach*, 211 P. 3d 688, 677 n.12 (Alaska 2009)).

[229] Docket 4 at 11, ¶ 55, 62.

[230] Docket 36 at 17–19.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 51 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 51 of 61

proximate cause and damages."[231]

Beginning with the first element, Howell seems to allege that Soto and Childers were subject to several different duties of care. In the complaint, Howell alleges that "defendants owed a duty to exercise reasonable care toward Dan Demott."[232] And in the opposition to the motion for summary judgment, Howell relies on the Restatement (Second) of Torts §§ 321-323 to contend that the defendants had a duty to "use reasonable care" to "prevent [a] risk from taking effect" and to "prevent further harm."[233] Howell also contends that "[t]he Municipality's employees assumed a duty to act without negligence when they responded to the call for assistance and when they later created the risk of harm to Dan Demott through unreasonable escalation of force on a mentally ill person in crisis."[234]

Howell also alleges in the complaint that "defendants failed to use reasonable de-escalation techniques," "unreasonably escalated force," and "unreasonably disregarded known risks," suggesting that Soto and Childers were subject to a duty to de-escalate.[235] To the extent that Howell may have alleged in

---

[231] *Lindsey v. E&E Auto. & Tire Serv., Inc.*, 241 P.3d 880, 885 (Alaska 2010) (quoting *Wickwire v. Arctic Circle Air Servs.*, 722 P.2d 930, 932 (Alaska 1986)).

[232] Docket 4 at 11, ¶ 57.

[233] Docket 36 at 17.

[234] Docket 36 at 18.

[235] Docket 4 at 11, ¶¶ 59–61.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 52 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 52 of 61

the complaint that Defendants violated a duty to de-escalate, Howell did not develop this argument in the opposition to the motion for summary judgment, so the issue is not before the Court.[236]

In response, Defendants point to several statutory provisions that they contend establish the required standard of care in this case. Indeed, under Alaska law, "where the legislature has considered and resolved conflicting policies by clearly enunciating a duty in a statute, the relevant statute should be considered and, in a proper case, adopted as the appropriate standard of care."[237] Defendants contend that Alaska Statute § 18.65.530(a) provides the appropriate standard of care, which provides that "[a] peace officer, with or without a warrant, shall arrest a person if the officer has probable cause to believe the person has, either in or outside the presence of the officer, within the previous 12 hours . . . committed domestic violence." Defendants accordingly contend that they had a duty to effectuate a mandatory arrest.[238] However, the Alaska Supreme Court has held that this statute does not create any actionable duty to arrest because "it expressly

---

[236] *See, e.g.*, *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 974 (E.D. Cal. 2018) ("At summary judgment, a party can waive an argument . . . by failing to brief an issue."); *see also Witte v. Wisconsin Dept. of Corrections*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [the argument] in his brief opposing summary judgment, he lost the opportunity to urge it in both the district court and this court."), *rev'd on other grounds, Hill v. Tangherlini*, 742 F.3d 965, 967 n.1 (7th Cir. 2013).

[237] *Busby v. Mun. of Anchorage*, 741 P.2d 230, 233 (Alaska 1987) (citations omitted).

[238] Docket 25–26.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 53 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 53 of 61

does not permit civil actions for the police's failure to arrest."[239]

Rather, the Court finds that the appropriate standard of care has been recognized by the Alaska Supreme Court as set forth in two other state statutes: Alaska Statutes § 12.25.070 and § 11.81.370(a).[240] Together, these statutes provide that a police officer "may not subject a person arrested to greater restraint than is necessary and proper for the arrest and detention of the person" and allow an officer to "use nondeadly force and [] threaten to use deadly force when and to the extent the officer believes it necessary to make an arrest."

The Court next considers breach. If a jury were to find the use of force excessive in violation of the federal Constitution, then the use of force would also violate Alaska Statute § 12.25.070 because the restraint used was greater than necessary to effectuate an arrest; likewise, the use of constitutionally excessive force would violate Alaska Statute § 11.81.370(a) because the officers could not have "reasonably believe[d]" that the force used was "necessary to make an arrest."[241]

With respect to causation, Alaska follows the "substantial factor test," requiring "the plaintiff to show that the accident would not have happened 'but for'

---

[239] *Dore v. City of Fairbanks*, 31 P.3d 788, 792–93 (Alaska 2001) (citing Alaska Stat. § 18.65.530(a) & (f)).

[240] *See, e.g., Maness v. Daily*, 307 P.3d 894, 900-01 n.11 (Alaska 2013); *Russell v. Virg-In*, 258 P. 3d 795, 802 (Alaska 2011).

[241] Alaska Stat. § 11.81.370(a).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 54 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 54 of 61

the defendant's negligence and that the negligent act was so important in bringing about the injury that reasonable individuals would regard it as a cause and attach responsibility to it."[242]  The question of proximate cause is usually a question of fact for the jury; it "becomes a matter of law only where reasonable minds cannot differ."[243]

In this case, Defendants contend that "[n]o evidence at all shows that Demott's death was a result of actions taken by the police."[244]  Howell responds that Demott died from exposure and that police officers made the house unreasonably cold by blowing out the windows on an evening in November when temperatures were below freezing.[245]  However, it is not entirely clear what impact the blown-out window by the main entrance and any other holes in the house that were caused by the deployment of force had on the temperature inside the house.[246]  For example, Childers testified that the residence was likely "much warmer" than outside because the structure "automatically blocks any kind of wind" and the "insulation, residual heat and the fact that heating systems . . . continued

---

[242] *Winschel v. Brown*, 171 P.3d 142, 148 (Alaska 2007) (citing *Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 (Alaska 1993)).

[243] *Id*. at 148 (citing *P.G. v. State*, 4 P.3d 326, 334 (Alaska 2000)).

[244] Docket 25 at 27.

[245] Docket 36 at 18; *see also* Docket 4 at 6, ¶ 18 ("The weather was below freezing.").

[246] Docket 25-1 at 3–4 (Childers reported that the window by the main entrance was blown open).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 55 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 55 of 61

to stay on" helped maintain the interior temperature of the house.[247]  Whether the SWAT team made the house unreasonably cold by blowing holes into the residence remains a question of fact for the jury.

That being said, Girardin informed the SWAT team at approximately 11:30 p.m. that he believed that Demott was in the crawl space and that Girardin had refused to go in the crawl space with Demott because it was "too cold."[248]  Indeed, the autopsy report stated that the temperature in the crawl space that night was 15 degrees Fahrenheit.[249]  Drawing all reasonable inferences in the light most favorable to Howell, a reasonable jury could find that the SWAT team's use of the tear gas, particularly after Girardin had left the residence, was a substantial factor in causing Demott to enter and remain in the crawl space where he died.  In sum, the Court finds that on causation, this is not a case where "reasonable minds cannot differ," so it is instead a question for the jury.[250]

Turning to damages, Defendants' contention that "there simply are [no damages]" is disingenuous because a man lost his life.[251]  Alaska law provides in relevant part that a decedent's children may recover damages "when the death of

---

[247] Docket 36-6 at 25–26.

[248] Docket 4 at 8, ¶ 34; Docket 25-1 at 28.

[249] Docket 25-1 at 8.

[250] *See Winschel*, 171 P.3d at 142 (citing *P.G.*, 4 P.3d at 334).

[251] Docket 25 at 27.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 56 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 56 of 61

a person is caused by the wrongful act or omission of another."[252]  In this case, both of Demott's adult children, Howell and Charlie, are seeking damages.[253]

In 2012, this Court held that adult children of a decedent are statutory beneficiaries only when they are dependent on the decedent.[254]  Since then, several Alaska Superior Court decisions have concluded otherwise.[255]  The Court need not revisit the issue at this time, because even if dependence is required for an adult child to recover damages under Alaska's wrongful death statute, Howell and Charlie have adequately alleged such dependence.[256]  The Alaska Supreme Court has held that "[d]ependency is a question of fact" and it "is appropriate for summary judgment only if there is no genuine factual dispute over the extent of [Howell's and Charlie's] reliance on [Demott]."[257]  Here, Howell and Charlie have alleged that they lived with their father and relied on him to pay several of their

---

[252] Alaska Stat. § 09.55.580(a).

[253] Docket 36 at 19–20.

[254] *Millo v. Delius*, 872 F. Supp. 2d 867, 878–79 (D. Alaska 2012).

[255] Docket 36-13 (citing *Jensen-Toft v. Schmidt*, Case No. 3AN-07-09206CI, at *8 (Alaska Super. Ct. April 14, 2011) ("The wrongful death statute . . . prefers surviving spouses and children over the estate.  That selection suggests that the legislature did not intend to favor the estate once a surviving child reached adulthood or was no longer dependent upon the decedent."), *cert. denied sub nom. State v. Jensen-Toft*, Case No. S-14282 (Alaska June 3, 2011); Docket 36-14 (citing *Gray v. Jones*, Case No. 3AN-09-05573CI, at *1 (Alaska Super. Ct. July 7, 2010) (deciding that adult children had a viable legal claim for damages under Alaska Stat. 09.55.580 as a result of the death of their mother).

[256] Docket 25-8 at 4–5.

[257] *Millo*, 872 F. Supp. 2d at 879 (quoting *Greer Tank & Welding, Inc. v. Boettger*, 609 P.2d 548, 551 (Alaska 1980)).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 57 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 57 of 61

living expenses at the time of his death.[258] They have sufficiently demonstrated dependence, if indeed such a showing is required by adult children, to seek damages pursuant to the Alaska wrongful death statute.[259]

Defendants also contend that Howell cannot recover pain and suffering damages pursuant to Alaska Statute § 9.55.570 because Howell has not introduced any evidence to show that Demott experienced pain and suffering prior to his death.[260] There can be little doubt that death from hypothermia or drowning causes pain and suffering, so the amount of damages recoverable pursuant to this statute is properly reserved for the jury.[261]

The Court next considers whether the Municipality would be vicariously liable for the officers' negligence. Under Alaska law, an employer is vicariously liable for the negligent conduct of its employees if that conduct occurred when the employee was acting within the scope of employment.[262] And courts applying Alaska law have repeatedly held that police officers are acting within the scope of

---

[258] Docket 36 at 10–11, 19.

[259] *North Slope Borough v. Brower*, 215 P.3d 308, 310, 314 (Alaska 2009) (upholding jury damages award to surviving mother of adult son as "other dependent" under the statute because of her dependence on son's subsistence and non-market support).

[260] Docket 25 at 32.

[261] *Cf. N. Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176, 1190–91 (Alaska 1977) (holding that the superior court properly instructed the jury to consider the question of the pain and suffering that a decedent suffered before their death).

[262] *Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 346 (Alaska 1990).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 58 of 61

their employment when they are making an arrest.[263]  Accordingly, if a jury finds that Soto and Childers were negligent, the Municipality would be vicariously liable for the damages caused by that negligence.

For the first time in the opposition to the motion for summary judgment, Howell appears to assert two new theories of negligence.  First, Howell contends that although she informed the 911 call taker about her father's mental health diagnoses and requested help getting her father to API, the 911 call taker failed to include the code "CTX" in the call log in accordance with the requirements of APD CIT policy.[264]  Second, Howell's opposition asserts that even though the CIT policy provides that "[a] CIT officer will be dispatched to handle these calls whenever possible," Officer Perez, who sought the arrest warrant for Demott, was not CIT certified, although he did complete 40 hours of CIT training.[265]  Howell contends further that Perez failed to consider Demott's mental health or seek a mental health

---

[263] *See, e.g.*, *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 584 (Alaska 2007) ("[M]aking arrests . . . is conduct that falls within the troopers' usual authority."); *Nolte v. Mun. of Anchorage*, No. 3:07-cv-002110TMB, 2010 WL 11519451, at *8 (D. Alaska Sept. 24, 2010) (finding that a municipality could be vicariously liable for the negligent conduct of its police officer and that its police officer was acting within the scope of his employment when he made a warrantless arrest); *Mulligan v. Mun. of Anchorage*, No. S-17635, 2021 WL 4191118, at *3 (Alaska Sept. 15, 2021) ("[Plaintiff] may pursue her claim for damages from the Municipality for the excessive force of its officers so long as the force was used within the scope of their employment, which the facts alleged appear to suggest.").

[264] Docket 36 at 3–4; Docket 36-8 (911 call); Docket 36-4 (call log).  Compare to APD's CIT Policy at Docket 36-3 at 3 ("[I]f there is an element of mental illness involved with the call . . . the call taker should indicate those circumstances in the details of the call, both in the narrative form and by adding the three letter code 'CTX' in the text of the call.").

[265] Docket 36-3 at 3; Docket 36-5 at 1–2.

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 59 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 59 of 61

consultation when making the decision to seek an arrest warrant in violation of the requirement that "[o]fficers, whether CIT-trained or not . . . [give consideration to] the need to possibly provide mental health services for the individual."[266]

Neither of these arguments were pleaded in the complaint and are not properly before the Court. Indeed, the complaint does not name either the 911 call taker or Perez as a defendant. Moreover, neither of the named Defendants in this case, Childers and Soto, was involved in the initial response to the 911 call or the decision to seek an arrest warrant.[267] Childers and Soto did not arrive on the scene until 8:20 p.m.—nearly two hours after the 911 call and over an hour after Perez arrived on scene.[268] The Court will not consider these arguments.

## CONCLUSION

In light of the foregoing, IT IS ORDERED that Defendants Municipality of Anchorage, Luis Soto, and Steven E. Childers' Motion for Summary Judgment at Docket 25 is GRANTED IN PART and DENIED IN PART as follows:

---

[266] Docket 36 at 3–4, 8; Docket 36-3 at 4.

[267] *See* Docket 25-1 at 13–16 (Perez's Police Report describes the process by which he sought an arrest warrant and does not mention Soto or Childers.).

[268] Docket 25-1 at 22, 25 (Call log reports that the 911 call was at 18:34, Perez arrived on scene at 19:13, SWAT was dispatched at 20:17, and both Childers and Soto arrived on the scene at 20:20. In addition, Howell's argument that the 911 call taker acted negligently by failing to include the CTX code suffers from a fatal causation issue: The responding officers were aware of Demott's mental health condition even though the 911 call taker did not include the CTX code in the call log. See, e.g., Docket 36-2 at 1 ("[T]he APD personnel were aware from the very beginning that they were dealing with a mentally ill person in crisis.").

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 60 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 60 of 61

- Summary judgment is GRANTED to Defendants with respect to Plaintiff's § 1983 claim that the Municipality of Anchorage is liable for its failure to train and failure to supervise its police officers.

- Summary judgment is GRANTED to Defendants with respect to Plaintiff's claim that the Municipality of Anchorage is liable for its employees' violation of the Fourth Amendment of the United States Constitution because there is no vicarious liability under § 1983.

- Summary judgment is GRANTED to Defendants with respect to Plaintiff's claim brought pursuant to the Alaska Constitution.

- Summary judgment is DENIED with respect to all remaining claims, including the claim against the individual Defendants alleging a violation of the Fourth Amendment of the United States Constitution and Plaintiff's common law negligence claim with respect to all Defendants.

DATED this 16th day of December, 2022 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order re Motion for Summary Judgment
Page 61 of 61

Case 3:20-cv-00301-SLG   Document 46   Filed 12/16/22   Page 61 of 61