# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

KELSEY HOWELL, as Personal
Representative for the Estate of Dan
Demott, Jr.,

               Plaintiff,

      v.

MUNICIPALITY OF ANCHORAGE, *et al.*,

               Defendants.

Case No. 3:20-cv-00301-SLG

## <u>DECISION AND ORDER</u>

This matter came before the Court for a four-day bench trial from March 18 to 21, 2024. The Court heard the testimony of nine witnesses, and the parties submitted exhibits. At the conclusion of trial, the Court requested supplemental briefing. Plaintiff Kelsey Howell filed Plaintiff's Closing Argument Brief Regarding Qualified Immunity on April 4, 2024, at Docket 94; and Plaintiff's Errata to Closing Argument Brief Re Qualified Immunity on April 5, 2024, at Docket 95. Defendants filed Municipal Defendants' Response to Plaintiff's Post-Trial Brief Re Qualified Immunity on April 11, 2024, at Docket 96. Based on the foregoing, and the record as a whole in this case, the Court now enters the following Findings of Fact and Conclusions of Law.[1]

---

[1] *See* Federal Rule of Civil Procedure 52(a)(1) ("In an action tried on the facts without a jury . . .

**FINDINGS OF FACT**

The Court finds the following facts by a preponderance of the evidence, unless otherwise specified:

1. Plaintiff Kelsey Howell is the daughter of Dan Demott, Jr. and is the personal representative of the Estate of Dan Demott, Jr.

2. On November 18, 2018, Plaintiff and her father got in an argument because Demott touched Howell's baby's face. Howell did not want Demott touching her baby's face because his hands were dirty.

3. Demott got "really angry," and "cornered" Howell. Howell put her hand in front of her face for fear that Demott would hit her.

4. At approximately 6:30 p.m., Howell called 911 and informed the dispatcher that Demott was "crazy," barricading the front door, "ripping the curtains down," and experiencing delusions that the police were watching him. She also told the dispatcher that Demott needed to go to Alaska Psychiatric Institute ("API"). Howell told the dispatcher that Demott had been diagnosed with bipolar disorder and manic depression, that he had been to API before, and that he was refusing to take his medication. She

---

the court must find the facts specially and state its conclusions of law separately."). .

also warned the dispatcher that Demott may not cooperate with the police because he had attacked the police on one prior occasion approximately four or five years prior.

5. When the police arrived, officers observed Demott through a window with a sword and what they initially thought was a rifle, although officers later stated that they were "confident it[] [was] a BB gun."  Howell was able to safely exit the residence with her children.  Howell's brother, Justin Charlie, was also outside the residence.   A man named Michael Girardin, however, remained inside the residence with Demott.   Girardin was homeless, and Demott had previously offered to let him stay at the residence in exchange for mechanical help.

6. At approximately 7:30 p.m., Charlie informed the police that his father had a sword and a BB gun.  In addition, Charlie informed officers that there was a .22 rifle and a .22 handgun locked in a safe inside the residence, but Charlie said that his father had lost the key to the safe and likely would not be able to find it because the residence was extremely messy.  Charlie also told the officers that the residence did not have a landline or Wi-Fi and that Demott did not have a cell phone.  At approximately 7:40 p.m., the Computer Aided Dispatch ("CAD") entry states

that the police began making several announcements to the residence.

7. The police obtained a search warrant of the residence and an arrest warrant for Demott. The arrest warrant charged Demott with three violations of municipal law. First, Demott was charged with "Assault-Fear of Imminent Injury" because "by words or other conduct, [he] recklessly place[d] . . . [Howell] in fear of imminent physical injury" in violation of Anchorage Municipal Code 8.10.010(B)(3). Second, he was charged with "Crim[inal] Mischief 5 – Property damage" because he "recklessly or intentionally injure[d] or destroy[ed] . . . real or personal property" in violation of Anchorage Municipal Code 8.20.010(A)(6). Third, he was charged with delaying or obstructing his arrest by barricading himself inside his home in violation of Anchorage Municipal Code 8.30.010(A)(3). The warrant classified the event as a domestic violence incident.

8. At approximately 8:20 p.m., a Special Weapons and Tactics (SWAT) team began to arrive at the scene. Both of the individual Defendants in this case were part of this SWAT team and arrived at that time. Defendant Luis Soto was a sergeant at the time whose role was to "coordinate and supervise the

tactics implemented by SWAT." However, Soto did not oversee SWAT's implementation of any tactics until they were approved and directed by the SWAT commander. Soto remained at the command center, which was located a few blocks away from the Demott residence, throughout the entire incident and did not personally make any loudspeaker announcements, fire projectiles, or deploy chemical agents.

9. Defendant Steven Childers was a sergeant at the time of the events described in this lawsuit. He was the designated arrest team/entry team leader, meaning that he was to guide and control the actual arrest of the suspect as safely as possible if they exited. However, he did not make the decisions as to which SWAT tactics to use or when to use them. Like Soto, Childers did not personally make any of the announcements or deploy projectiles; however, Childres did introduce chemical agents into the residence.

10. Both of the individual Defendants in this case acted under color of state law at all relevant times.

11. When the SWAT team arrived, the patrol officers told the SWAT team about the potential rifle in the home and told the SWAT team that Demott was not threatening them with the

weapon.

12. Over the next several hours, the SWAT team made dozens of announcements via a loudspeaker, repeatedly identifying themselves as the Anchorage Police Department ("APD"). The announcements also repeatedly informed Demott that there was a warrant for his arrest and a search warrant for his residence; commanded both Demott and Girardin to leave the residence; and warned that the SWAT team would use force against Demott, including tasers, direct impact munitions, gas, and K9s. In addition to the announcements, a high pitched siren was used.

13. At no time was the loudspeaker used to try to negotiate with Demott or Girardin, or to try to address Demott's mental health needs, or to serve as a means for family or friends of Demott to communicate with him. The Crisis Intervention team members that were at the incident did not make any announcements over the loudspeaker at any time.

14. Just before 11:00 p.m., the SWAT team deployed baton rounds and "knock-knocks." Knock-knocks are foam projectiles that are deployed against the structure in order to gain the attention of the suspect. The baton rounds were used

to break a large window by the front door. The SWAT team then made more announcements and, after receiving no response, deployed additional projectiles at the main entrance door and garage man door as agitation. According to the CAD report, an officer saw Demott at a window just after the second deployment at approximately 11:00 p.m.; this was the last time that Demott was reportedly seen alive. There is no indication that Demott had a firearm at that time; he was noted to have moved away from the window at that time. Shortly after 11:30 p.m., there was a report of loud banging coming from inside the residence.

15. Minutes later, at 11:36 p.m., the SWAT team deployed its first round of chemical agents into the residence. These were projected inside the residence and into the attached garage, with the intent being to create an irritant strong enough to cause the barricaded suspect to exit the structure. Childers successfully deployed a baffled Carbon Monosulfide (CS) grenade through the window near the main entrance door.

16. Minutes after the first round of chemical agents was deployed, Girardin exited the residence. He had not been harmed by Demott.

17. Shortly after Girardin left the residence, Childers deployed another Tri-chamber CS grenade into the garage because his first attempt had deflected off a window. This additional CS grenade was deployed less than 20 minutes after Girardin had left the home. It appears from the CAD report that at least one other SWAT team member deployed additional CS gas into the home at that time.[2]

18. Girardin spoke to at least two officers after he left the home about what had happened inside the residence. His reports had some inconsistencies. For example, Girardin informed the officers that he did not hear the officers calling his name because he had taken a couple of Dayquil pills. However, he also said that he did not leave the residence because Demott threatened to shoot him if he left. But he also told the police that he did not see any weapons in the home, except that he knew that Demott had BB guns and that when the police broke the windows, Demott had two swords but then dropped them. Girardin further told police that Demott was experiencing a Vietnam flashback. Additionally, Girardin informed the police

---

[2] See Ex. P-1 at 23:55. The CAD also reflects that some of the SWAT team had stopped shooting the gas into the house because "someone came out" of the residence. Ex. P-1 at 23:52:26.

that he believed that Demott was going into the crawl space. Girardin also told the officers that Demott had encouraged Girardin to get in to the crawl space, which Demott referred to as a "bunker," but Girardin had declined to do so because it was too cold in the crawl space.

19. Six more rounds of CS gas were deployed into the garage and the house, but not into the crawl space, at 12:43 a.m., approximately one hour after Girardin had left the residence. A robot sent into the house soon after did not detect any movement, although the robot's mobility was impeded by stuff on the floor.

20. At 1:28 a.m., the SWAT team initiated another six rounds of CS gas into the residence; this gas was deployed into the crawl space.

21. At some point after 2:00 a.m., the SWAT team decided to enter the residence. Childers was one of the SWAT team officers who entered the residence. The SWAT team looked for Demott using a robot, a K-9 police dog, and a pole-cam.

22. The SWAT team found Demott's body submerged in water inside the crawl space at approximately 4:15 a.m. According to the autopsy report, Demott died from either hypothermia or

drowning. The ambient air temperature at that time was 15 degrees Fahrenheit. Demott had "abrasions and contusions of flexor surfaces of extremities and on trunk," but the report concluded that the "trauma [was] insignificant to cause death." His death was classified as an accident.[3]

23. On November 4, 2020, Howell, in her capacity as personal representative of Dan Demott, initiated this action in Alaska state court. With respect to Soto and Childers, Howell brings a claim pursuant to 42 U.S.C. § 1983, alleging that these Defendants used excessive force when attempting to arrest Demott, in violation of Demott's Fourth Amendment right under the United States Constitution to be free from unreasonable seizure.[4] Howell's Complaint also pleads a state law negligence claim for failure to exercise reasonable care and failure to use reasonable de-escalation techniques when executing the arrest warrant, which is in essence an excessive force claim.[5]

24. With respect to the Municipality, the Court previously granted

---

[3] Exhibit P-40.

[4] Docket 4 at 12, ¶¶ 67–68.

[5] Docket 4 at 11, ¶¶ 57, 59–62.

summary judgment on Plaintiff's claim that the Municipality is vicariously liable for the violation of Demott's Fourth Amendment right under the United States Constitution. The Court previously granted summary judgment to the Municipality on Plaintiff's Section 1983 failure to train and supervise claim.[6]

25.  The Court also granted summary judgment to all Defendants for any claims arising under the Alaska Constitution.[7]  Howell's Complaint also contends that the Municipality is vicariously liable for the negligence of its employees and directly liable for inadequately training or supervising its employees.[8]

26.  Soto and Childers participated in the planning and execution of the use of force.  Soto coordinated and supervised the SWAT team's tactics so they were done in accordance with APD policies and procedures after they were approved and directed by the SWAT commander. And Childers deployed chemical agents and did not object to their use by others. The Court therefore concludes that both Soto and Childers can be

---

[6] Docket 46 at 61.

[7] Docket 46 at 61.

[8] Docket 4 at 11, ¶ 55; 13, ¶ 76.

held liable under the integral-participant doctrine.

27. In this case, APD was responding to Howell's report that she feared an imminent assault by her father—a form of domestic violence. The Ninth Circuit has recognized that "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call."[9] Additionally, Alaska law provides that "[a] peace officer, with or without a warrant, *shall* arrest a person if the officer has probable cause to believe the person has, either in or outside the presence of the officer, within the previous 12 hours . . . committed domestic violence . . . whether the crime is a felony or a misdemeanor."[10] Because there was probable cause to believe that Demott had committed a misdemeanor crime of domestic violence, Childers and Soto were attempting to effectuate a mandatory arrest under Alaska law.

28. The Ninth Circuit has also observed, however, that "the

---

[9] *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)).

[10] Alaska Stat. § 18.65.530(a)(1) (emphasis added).

legitimate escalation of an officer's 'concern[] about his or her safety' is less salient 'when the domestic dispute is seemingly over by the time the officers begin their investigation.'"[11] Here, Howell and her children had already left the house by the time the SWAT team arrived and the incident that led to the warrants' issuance had ended several hours before the SWAT team used the chemical agents, less lethal rounds, and knock-knocks at the residence. Accordingly, the severity of the crime had substantially abated when that force was applied.

29. When police officers first arrived at the scene, they were concerned that Demott had a rifle; but by 7:34 p.m., they were "confident" it was "a BB gun." One police officer reported hearing Demott say he "would shoot us through [the] window," but the officer confirmed that "no gun [was] seen." Police officers were also aware that Demott had access to a sword.

30. Early on in the incident, Charlie informed the police officers that that there was a .22 rifle and a .22 handgun locked in a safe in the home, but he also said that Demott likely would not be able to access these weapons because Demott had lost the key and

---

[11] *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (alterations in original) (quoting *Mattos*, 661 F.3d at 450).

his home was extremely messy. Indeed, at 7:34 p.m., the CAD reported that "real rifles in [the] res[idence] should be in [the] safe" and that "he does not have [the] key."[12] And while the passage of time may have increased the risk that Demott would locate the key to the safe,[13] when Girardin left the residence at 11:30 p.m., he informed the officers that he had not seen any firearms in the residence that evening.

31. Police officers were also aware that Demott had some history of violence. For example, Howell informed the police officers that Demott had attacked police officers once four or five years prior, although she did not provide any details about that incident. Howell also informed police officers that Demott had hit Howell one time in the past but indicated it was gently and with a toy sword.

32. Although the SWAT team made at least 50 announcements over the loudspeaker commanding the men to exit the home and warning them that lethal and nonlethal force could be used

---

[12] Exhibit P-1 at 2.

[13] *Cf. Alford v. Humboldt Cnty.,* 785 F. Supp. 2d 867, 877 (N.D. Cal. 2011) ("The passage of time increased [the decedent's] opportunity to find the rifle ammunition, which was not in a safe, and to locate the other high-powered weapons and ammunition, and figure out a way to unlock the safe they were in.").

against them, the SWAT team did not try to negotiate with Demott or take any action that took into account Demott's mental health issues.

33. When the SWAT team deployed the less lethal rounds and the first round of tear gas, Girardin was still in the house with Demott, increasing the nature of the threat at that time because of the potential hostage situation.[14] At this point in time, this *Graham* factor suggests that the use of force was reasonable. But after Girardin had exited the residence safely, the nature of the threat that Demott posed to others substantially decreased, as the SWAT team was no longer responding to a potential hostage situation.[15] And Girardin informed the SWAT team that Demott was experiencing Vietnam flashbacks, did not have weapons, and was retreating to the crawl space.[16] Accordingly, the SWAT team was then made aware that Demott was an unarmed man experiencing a mental health

---

[14] *Compare Lock v. Jenkins*, 641 F.2d 488, 496 (7th Cir. 1981) (holding that the use of tear gas was not unjustified following the taking hostage of a prison warden and several others), *with Est. of Escobedo v. Bender*, 600 F.3d 770, 782–84 (7th Cir. 2010) (*Escobedo I*) (holding that the law was clearly established that the use of tear gas against an armed suicidal man barricaded in his apartment violated the Fourth Amendment because, among other reasons, the man was not holding hostages).

[15] *See Escobedo I*, 600 F.3d at 780–81.

[16] Docket 25-1 at 21; Docket 36 at 9; Docket 36-12 at 8.

crisis who was refusing to leave his house. This *Graham* factor, therefore, tips strongly against the reasonableness of the use of force after Girardin's exit.

34. The Court next considers the fact that Demott was resisting arrest insofar as he was refusing to leave his home despite repeated orders to do so.[17] Throughout the entire incident, Demott remained in his residence, a location that prevented immediate law enforcement access, and refused to follow numerous commands to exit.

35. When Howell first called 911, she informed the dispatcher that her father had barricaded the front door with plywood, although she also said that she thought she could take it down. In any event, Howell was able to promptly leave the residence by 7:15 p.m. That being said, when Girardin exited the residence, he informed the SWAT team that Demott had the front entryway barricaded well with anything and everything that he could use.

36. The SWAT team had time on its side because it had up to 12

---

[17] *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)); *Lombardo v. City of St. Louis*, 594 U.S. 464, 467 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)) (holding that courts should consider "whether the plaintiff was actively resisting").

hours to effectuate a mandatory arrest.[18]  This was not a case in which the police officers were "forced to make split-second judgments" in a circumstance that was "tense, uncertain, and rapidly evolving."[19]  Police officers arrived on the scene at approximately 6:45 p.m, and Girardin left the residence shortly after the first round of chemical agents were deployed, at 11:36 p.m.

37. Although the officers waited several hours before using intermediate non-lethal force against Demott, they did not appear to have taken advantage of this time to pursue any strategies to address Demott's mental health crisis but simply continued to make the same announcements over the loudspeaker system that went unheeded.  Hence, the Court finds that while Demott was resisting arrest, he was not physically struggling with or threatening the officers;  rather, he was trying to disengage from them.  In sum, the Court concludes that Demott was passively, rather than actively, resisting arrest, such that this *Graham* factor is neutral.

38. "The gravity of the particular intrusion that a given use of force

---

[18] Alaska Stat. § 18.65.530(a)(1).

[19] *Tekle v. United States*, 511 F.3d 839, 847 (9th Cir. 2007) (citation omitted).

imposes upon an individual's liberty interest is measured with reference to 'the type and amount of force inflicted.'"[20]  When the SWAT team deployed less lethal rounds and tear gas while Girardin remained in the residence, the SWAT team could reasonably have been of the view that Girardin's life was at risk.  But once Girardin exited the house unharmed by Demott, there did not appear to be any innocent members of the public who were then at risk of harm.  Nor were the officers, who were heavily fortified outside the residence, at serious risk of harm at that time.

39. After Girardin left the residence, it was unconstitutionally excessive force for the SWAT team to continue to fire multiple rounds of chemical agents into the home, because Demott was suspected of only minor crimes, posed no apparent threat to the officers or others, and was engaged in only passive resistance.

40. The SWAT team knew that Demott was acting "crazy" and had been diagnosed with bipolar disorder and manic depression but was refusing to take his medication.  The SWAT team also

---

[20] *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001)).

was later informed by Girardin that Demott was experiencing Vietnam flashbacks. Moreover, Demott had not physically harmed anyone through the lengthy incident. Despite these facts, which show that Demott's mental health condition diminished the government's interest in using force against him, the SWAT team did not take any action to address Demott's mental health.

41. Although 11 APD officers at the scene had participated in a 40-hour critical intervention training, and members of the Crisis Negotiation Team were at the scene, neither Childers nor Soto consulted on mental health strategies. Although some officers testified that they had taken Demott's mental health into consideration, there is no indication that they changed any of their tactics or approach due to Demott's mental health. To the contrary, Childers testified that the SWAT team's response on the night in question was "almost textbook of a SWAT callout," and acknowledged that the SWAT team made no accommodations for Demott's mental health or deviation from its standard progression in using force throughout this incident. Indeed, at the time of the incident, both Childers and Soto erroneously believed that APD's Crisis intervention Team

policy did not apply when an individual in crisis is suspected of committing a crime.

42. Demott posed a threat to Girardin's safety while Girardin remained in the house. But after Girardin had left the house unharmed, Demott was a lone individual experiencing a mental health crisis in his home who was retreating to the crawl space. He was no longer an immediate threat to the safety of the officers or others. Therefore, Childers and Soto were constitutionally required to have considered a mental health intervention or other less invasive alternatives before deploying additional CS gas into the residence after Girardin left the home.

43. After Girardin left the home, Childers' successful "deployment of the Tri-chamber CS grenade into the garage in order to make up for the baffled grenade that bounced off the window" less than 20 minutes after the initial deployment at approximately 11:36 p.m., constituted an excessive use of force in violation of the Fourth Amendment.[21]

44. It is more likely than not that Demott was alive at the time of

---

[21] Ex. P-2 at 5; Ex. P-1 at 7.

that deployment, and it is more likely than not that the deployment caused him significant pain and suffering— indeed, it was intended to cause him pain and suffering.

45. By 12:19 a.m., the SWAT team was aware that Demott was likely in the home's crawl space. Despite that knowledge, the SWAT team deployed six more rounds of CS gas into the garage and house at 12:43 a.m., but not into the crawl space. If Demott was still alive at that point, the likely result of that deployment would have been to keep him in the crawl space, not to have him exit out of the crawl space through the gas-infused residence.

46. The deployment of the six CS gas canisters at 12:43 a.m. into the home was an unconstitutionally excessive use of force.

47. The Court cannot find it more likely than not that Demott was alive at the time of the 12:43 a.m. deployment.

48. Demott's estate is entitled to damages for the pain and suffering he endured when the additional gas canisters, at around 11:55 p.m., were fired into the house approximately 20 minutes after Girardin had exited the home unharmed by Demott and had described Demott as alive at that time.

49. The Court awards $50,000 to Kelsey Howell, as personal

representative of the Estate of Dan Demott, from Defendants Steven E. Childers and Luis Soto, for the pain and suffering he endured as a result of the excessive force used against him prior to his death.

50. The excessive force deployed by Childers and Soto was a substantial factor in causing the death of Demott. And it is more likely than not that the SWAT team's use of unconstitutionally excessive force against Demott was an actual cause of his death; that is, that Demott's death would not have occurred but for the continuing use of force deployed by the SWAT team after Girardin's departure from the residence.

51. There were reasonable alternatives available to the SWAT team after Girardin had left the residence, including using the PA system to try to communicate in a more positive manner with Demott, throwing a phone into the residence and using the PA system to tell Demott how he could use the phone, further communicating with Demott's family and Girardin for suggestions on how to de-escalate the situation so Demott would voluntarily exit the residence, playing a prerecorded statement from Charlie to Demott, among other options. And

the SWAT team could have consulted with mental health professionals, such as APD officers who were Crisis Intervention trained. Using these alternatives, and/or informing Demott that the police were going to stay outside the home, urging him to leave the crawl space, informing Demott that they were stopping their announcements and intermediate force deployments for the next hour, and waiting for Demott to voluntarily exit could well have kept Demott alive that night, at least on a more likely than not basis.

52. Kelsey Howell and Justin Charlie are adult children of Dan Demott. Each was dependent on Demott for their housing at the time of his death, although that dependency was unlikely to continue due to the imminent foreclosure sale of Demott's home.

53. Both Howell and Charlie have suffered a loss of the companionship due to the death of Dan Demott.

54. Pursuant to Alaska law, the Court awards Howell, as personal representative of the Estate of Dan Demott, Jr., $50,000 for Howell's loss of the companionship of her father, and $50,000 for Charlie's loss of companionship of his father.

55. Plaintiff did not present sufficient evidence to support an award

of pecuniary damages and stated during closing argument that the Estate was not seeking pecuniary damages.

56. Plaintiff has not established that the conduct of Childers or Soto was motivated by an evil motive or intent, or that it involved reckless or callous indifference to the federally protected rights of others.

57. Plaintiff has not established by clear and convincing evidence that the conduct of Childers or Soto was outrageous, such as done with malice, bad motive, or reckless indifference to the interest of another.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over Howell's 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331. The Court exercises its supplemental jurisdiction over Howell's state law claims pursuant to 28 U.S.C. § 1367.

2. The doctrine of qualified immunity shields government actors from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[22]

---

[22] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).

3. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[23] "In Fourth Amendment excessive force cases, we examine whether police officers' actions are objectively reasonable given the totality of the circumstances."[24]

4. To determine the reasonableness of the force used, a court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[25] The Ninth Circuit has repeatedly emphasized that the second factor—the immediate threat to the safety of the police officers and to others—is the most important.[26] Other circumstances to consider include

---

[23] *Graham*, 490 U.S. at 395 (emphasis omitted).

[24] *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (citations omitted).

[25] *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9).

[26] *See, e.g.*, *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013-14 (9th Cir. 2017) ("Of all of these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" (quoting *George*, 736 F.3d at 838)).

"the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; [and] the threat reasonably perceived by the officer."[27]   Additional relevant factors may "include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."[28]

5.   "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[29]   "Only information known to the officer at the time the conduct occurred is relevant."[30]   And while the availability of alternative measures to take a suspect into custody may be a relevant consideration in some cases, officers "need not avail

---

[27] *Lombardo*, 594 U.S. at 467 (quoting *Kingsley*, 576 U.S. at 397).

[28] *Glenn v. Wash. Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

[29] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

[30] *Nehad*, 929 F.3d at 1132 (citations omitted).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order and Decision
Page 26 of 36
Case 3:20-cv-00301-SLG     Document 97     Filed 12/16/24     Page 26 of 36

themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."[31] Additionally, "[t]he gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to 'the type and amount of force inflicted.'"[32]

6. The Ninth Circuit has explained that "[u]nder our cases, an official whose 'individual actions' do 'not themselves rise to the level of a constitutional violation' may be held liable under section 1983 only if the official is an 'integral participant' in the unlawful act."[33]  The minimum level of involvement for liability under the integral-participant doctrine occurs in two situations:

> those in which (1) the defendant knows about and acquiesces in the constitutionally defective conduct as part of a common plan with those whose conduct constitutes the violation or (2) the defendant "set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury."[34]

7. With respect to the first category, the Ninth Circuit has held that

---

[31] *Hughes v. Kisela*, 841 F.3d 1081, 1087 (9th Cir. 2016) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), *rev'd on other grounds*, *Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam).

[32] *Young*, 655 F.3d at 1161  (quoting *Deorle*, 272 F.3d at 1279).

[33] *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (quoting *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020)).

[34] *Id*. (alterations in original) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

officers are integral participants if an "officer was aware of the decision to use the [force], did not object to it, and participated in the . . . operation knowing the [force] was to be deployed."[35] Simply being present at the scene is not enough; the officer must have participated in either the planning or the execution of the unlawful use of force.[36]

8. Chemical agents such as tear gas are identified as "intermediate force" because they are "capable of inflicting significant pain and causing serious injury" and "present a significant intrusion upon an individual's liberty interests," although they are "less severe than deadly force."[37] Recent research shows that tear gas and pepper spray cause "acute respiratory symptoms" and "can cause serious and long-lasting lung problems, skin burns, eye injuries and even death."[38] The use of chemical agents in addition to less lethal projectiles are considered significant force.[39] In cases such as

---

[35] *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).

[36] *See Peck*, 51 F.4th at 889 (citing *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009)).

[37] *Young*, 655 F.3d at 1161 (analyzing the quantum of force deployed by pepper spray and baton blows)*; see Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979) ("[U]se of potentially dangerous quantities [of tear gas] is justified only under narrowly defined circumstances.").

[38] *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066,1083 (N.D. Cal. 2020).

[39] *Id*. at 1086–87 ("[C]hemical agents [and] less lethal projectiles . . . constitute significant force."

this one, there was "sufficient notice of the need for caution when using . . . aggressive tactics to subdue a mentally unstable individual who is resisting arrest."[40]

9. At the time of this incident in November 2018, it was clearly established that police officers violate a suspect's Fourth Amendment rights when they use chemical agents and projectiles against individuals who were "suspected of, at most, minor crimes, who posed no threat to the officers or others, and who engaged in only passive resistance."[41]

10. Childers and Soto were both integral participants in the use of the chemical agents and projectiles into the home after Girardin had exited the residence.

11. "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a

---

(first citing *Young*, 655 F.3d at 1161; and then citing *Deorle*, 272 F.3d at 1285)).

[40] *Alford*, 785 F. Supp. 2d at 876-79, 882 (concluding that there was a genuine issue of material fact on reasonableness when an officer deployed a pyrotechnic device into a home where a man experiencing a mental health crisis had barricaded himself).

[41] *Hyer v. City and Cnty. of Honolulu*, 118 F.4th 1044, 1068 (9th Cir. 2024) (quoting *Nelson v. City of Davis*, 685 F.3d 867, 886 (9th Cir. 2012)); *Young*, 655 F.3d at 1168.

serious offense."[42]   When possible, "the use of officers and others trained in the art of counseling is ordinarily advisable."[43] "This is because when dealing with a disturbed individual, 'increasing the use of force may . . . exacerbate the situation,' unlike when dealing with a criminal, where increased force is more likely to 'bring[] a dangerous situation to a swift end.'"[44] And "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."[45]

12. "Where there is no need for force, any force used in constitutionally unreasonable."[46]

---

[42] *Deorle*, 272 F.3d at 1282–83; *see id.* at 1283 ("[W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, this is a factor that must be considered in determining . . . the reasonableness of the force employed.").

[43] *Id.* at 1283.

[44] *Glenn*, 673 F.3d at 877 (alterations in original) (quoting *Deorle*, 272 F.3d at 1283).

[45] *Deorle*, 272 F.3d at 1283.

[46] *Fontana v. Haskin,* 262 F.3d 871, 880 (9th Cir. 2001) (internal quotation marks and emphasis omitted).

13. The Supreme Court has held that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'"[47] However, "[i]n § 1983 actions . . . the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action."[48] "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action."[49]

14. Under Alaska law, "[a]ll causes of action by one person against another . . . survive to the personal representative[]."[50] Further, Alaska Stat. § 09.55.580(a) provides that:

[W]hen the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefore against the latter, if the former might have maintained an action, had the person lived, against the latter for an injury done by the same act or omission.

---

[47] *Ochoa v. City of Mesa*, 26 F.4th 1050, 1057 (9th Cir. 2022) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (omission in original)).

[48] *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998), *as amended* (Nov. 24, 1998) (citing 42 U.S.C. § 1988(a)).

[49] *Id.*

[50] Alaska Stat. § 09.55.570.

An award to the personal representative of the Estate for Demott's predeath pain and suffering is recoverable under this statute.

15. A claim for loss of companionship may be brought under the Fourteenth Amendment Due Process Clause; to prevail, a plaintiff must establish that the defendant's conduct "shocks the conscience."[51]

16. Plaintiff did not bring a claim under the Fourteenth Amendment for the children of Demott's loss of companionship of Demott.

17. The standard for excessive force under Alaska law is "nearly identical" to the federal standard. "[T]he three considerations that frame the excessive force inquiry are the severity of the crime, whether the suspect immediately threatens the safety of the police or others, and whether the suspect is actively resisting or fleeing arrest."[52]

18. "Alaska 'usually follows federal case law in the area of qualified

---

[51] *Ochoa*, 26 F.4th at 1054 ("The plaintiffs' Fourteenth Amendment [loss of companionship] claim requires them to show that the officers' conduct "shocks the conscience"—a standard that requires more of the plaintiffs than the Fourth Amendment excessive-force standard . . . .").

[52] *Russell v. Virg-In*, 258 P.3d 795, 802 (Alaska 2011) (citing *Samaniego v. City of Kodiak*, 2 P.3d 78, 86 (Alaska 2000), *overruled in part by Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008)).

immunity.'"[53]

19. Because the Court has found that the use of force violated the Fourth Amendment of the Federal Constitution, the use of force also violated Alaska Statute § 12.25.070 because the restraint used (the additional CS gas) was "greater restraint than . . . necessary and proper" to effectuate an arrest.  And the use of unconstitutionally excessive force also violated Alaska Statute § 11.81.370(a) because the officers could not have "reasonably believe[d]" that the force used was "necessary to make an arrest."

20. Alaska law provides that the personal representative of the estate of a decedent may seek damages for a decedent's children "when the death of a person is caused by the wrongful act or omission of another."[54]  Such damages may include recovery for loss of companionship.

21. Alaska Statute § 09.55.570 allows the personal representative of the estate of a decedent to seek damages for the pain and suffering experienced by a decedent prior to his death;  here, such damages would be duplicative of the damages this Court

---

[53] *Id.* at 803 (quoting *Sheldon*, 178 P.2d at 463).

[54] Alaska Stat. § 09.55.580(a).

has awarded under Section 1983 for the same loss.

22. The Municipality of Anchorage is vicariously liable for the negligent conduct of its police officers under state law; it is not vicariously liable for the Fourth Amendment violations of its police officers under federal law.[55]

23. "[P]unitive damages in an action under § 1983 [are permitted] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[56]

24. Because the Court has found that neither individual defendant's conduct was shown to be motivated by evil motive or intent, or that it involved reckless or callous indifference to the federally protected rights of others, no punitive damages are awarded under federal law.

25. Under Alaska law, "[t]o support a claim for punitive damages, the plaintiff must show 'by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done

---

[55] *Taranto v. N. Slope Borough*, 909 P.2d 354, 358 (Alaska 1996) ("[A] municipality is vicariously liable for the actions of its employees, agents, and officers under the traditional tort principle of *respondeat superior*."); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

[56] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Case No. 3:20-cv-00301-SLG, *Howell v. Municipality of Anchorage, et al.*
Order and Decision
Page 34 of 36

with malice, bad motive, or reckless indifference to the interests of another.'"[57]

26. Because the Court has found that Plaintiff has not established by clear and convincing evidence that the conduct of Childers or Soto was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another, Plaintiff is not entitled to punitive damages under state law.

IT IS SO ORDERED. The Clerk of Court shall enter judgment for Plaintiff as follows:

1. The Court awards $50,000 to Kelsey Howell, as personal representative of the Estate of Dan Demott, Jr. for the pain and suffering he endured as a result of the excessive force used against him prior to his death; this amount is to be paid by Luis Soto and Steven Childers, jointly and severally.

2. Pursuant to Alaska law, the Court awards $100,000 to Kelsey Howell, as personal representative of the Estate of Dan Demott, Jr., to compensate Howell in the amount of $50,000 for the loss of the companionship of her father, and to compensate Justin Charlie

---

[57] *Brandner v. Hudson*, 171 P.3d 83, 89 (Alaska 2007) (quoting *Chizmar v. Mackie*, 896 P.2d 196, 210 (Alaska 1995)); *see* Alaska Stat. 09.17.020.

$50,000 for the loss of companionship of his father; this amount is to be paid by Luis Soto, Steven Childers, and the Municipality of Anchorage, jointly and severally.

The Clerk of Court shall enter a final judgment accordingly.

DATED this 13th day of December 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE